PEARSALL *v.* GREAT NORTHERN RAILWAY COMPANY.

APPEAL FROM THE CIRCUIT COURT OF THE UNITED STATES FOR THE DISTRICT OF MINNESOTA.

No. 768. Submitted December 16, 1895. — Decided March 30, 1896.

In 1856, the Minneapolis and St. Cloud Railroad Company was incorporated by the legislature of the Territory of Minnesota, with authority to construct a railroad on an indicated route, and to connect its road by branches with any other road in the Territory, or to become part owner or lessee of any railroad in said Territory; and also "to connect with any railroad running in the same direction with this road, and where there may be any portion of another road which may be used by this company." By a subsequent act it was, in 1865, authorized "to connect with or adopt as its own, any other railroad running in the same general direction with either of its main lines or any branch roads, and which said corporation is authorized to construct;" "to consolidate the whole or any portion of its capital stock with the capital stock or any portion thereof of any other road having the same general direction or location, or to become

merged therein by way of substitution;" to consolidate any portion of its road and property with the franchise of any other railroad company or any portion thereof; and to consolidate the whole or any portion of its main line or branches with the rights, powers, franchises, grants and effects of any other railroad. These several rights, privileges and franchises were duly accepted by the railway company, and its road was constructed and put in operation. In 1874 the State of Minnesota enacted that "no railroad corporation or the lessees, purchasers or managers of any railroad corporation shall consolidate the stock, property or franchises of such corporation with, or lease or purchase the works or franchises of, or in any way control any other railroad corporation owning or having under its control a parallel or competing line; nor shall any officer of such railroad corporation act as the officer of any other railroad corporation owning or having the control of a parallel or competing line; and the question whether railroads are parallel or competing lines shall, when demanded by the party complainant, be decided by a jury as in other civil issues;" and in 1881 its legislature enacted that "no railroad corporation shall consolidate with, lease or purchase, or in any way become owner of, or control any other railroad corporation, or any stock, franchise, rights of property thereof, which owns or controls a parallel or competing line." In 1889 the company changed its name to Great Northern Railway Company and extended its road towards the Pacific. The Northern Pacific Railroad being about to be reorganized, it was proposed that the Great Northern company should guarantee, for the benefit of the holders of the bonds to be issued by the reorganized company, the payment of the principal of, and interest upon such bonds, and as a consideration for such guaranty, and as a compensation for the risk to the stockholders, the reorganized company should transfer to the shareholders of the Northern company, or to a trustee for their use, one half the capital stock of the reorganized company; and that the Northern Pacific should join with the Great Northern in providing facilities for an interchange of cars and traffic between their respective lines, and should interchange traffic with the Northern company, and operate its trains to that end upon reasonable, fair and lawful terms under joint tariffs or otherwise, the Northern company having the right to bill its traffic, passengers and freight from points on its own line to points on the Northern Pacific not reached by the Great Northern, with the further right to make use of the terminal facilities of the Northern Pacific at points where such facilities would be found to be convenient and economical, jointly with that company. A stockholder of the Great Northern company filed this bill against it, to restrain it from carrying out such agreement. *Held*, that the Great Northern company was subject to the provisions of the acts of 1874 and 1881, and that the proposed arrangement was in violation of the provisions in those acts prohibiting railroad corporations from consolidating with, leasing or purchasing, or in any other way becoming the owner of, or controlling any other railroad corporation, or the stock, franchises or rights of property thereof, having a parallel or

competing line, and was therefore beyond the corporate power of the company to make.

Where, by a railway charter, a general power is given to consolidate with, purchase, lease or acquire the stock of other roads, which has remained unexecuted, it is within the competency of the legislature to declare, by subsequent acts, that this power shall not extend to the purchase, lease or consolidation with parallel or competing lines.

Where a charter authorizes a company in sweeping terms to do certain things which are unnecessary to the main object of the grant, and not directly and immediately within the contemplation of the parties thereto, the power so conferred, so long as it is unexecuted, is within the control of the legislature and may be treated as a license, and may be revoked, if a possible exercise of such power is found to conflict with the interests of the public.

The court epitomizes, in its opinion, several previous cases for the purpose of showing the general trend of opinion in this court upon the subject of corporate charters and vested rights.

THIS was a bill in equity filed by Pearsall, a stockholder in the Great Northern Railway, against the company, which is a corporation created and existing under the laws of the Territory and State of Minnesota, and a citizen of that State, to enjoin it from entering into and carrying out a certain agreement between that company and the holders of bonds secured by the second and third general mortgages, and the consolidated mortgage of the Northern Pacific Railroad Company, under which, upon a sale and foreclosure of the mortgages given to secure such bonds, the holders were to purchase or cause to be purchased the property and franchises of the Northern Pacific Railroad Company.

Plaintiff set up that he was the holder of five hundred shares of $100 each of the preferred paid up stock of the defendant corporation; that such stock is of the value of more than $125 per share, but that the proposed arrangement, if consummated, would decrease the value of his stock and damage him to an amount exceeding $5000. The suit was brought for the benefit of the plaintiff and all stockholders similarly situated. The facts as they appear in the bill and answer, upon which the case was heard, are substantially as follows:

The defendant, the Great Northern Railway, is a corpora-

tion organized and existing under the act of the legislature of the Territory of Minnesota of March 1, 1856, c. 160, Gen. Laws 1856, 294, to incorporate the Minneapolis and St. Cloud Railroad Company, and a number of amendatory acts not necessary to be noticed in detail. By the original act, the Territory granted to the railroad company (§ 1) the right to be a corporation, the right to acquire by purchase, gift, grant, devise or otherwise, and to hold and to convey all such property, real and personal, which should be necessary or convenient to carry into effect the objects and purposes of the corporation; the right (§ 2) to construct and operate a railroad from Minneapolis to St. Cloud, (about 75 miles,) and also to a point at or near the mouth of the St. Louis River, (about 180 miles,) with the further power (§ 6) to connect its road by branches with any other road in the Territory, or to become part owner or lessee of any railroad in said Territory, and also (§ 12) "to connect with any railroad running in the same direction with this road, and where there may be any portion of another road which may be used by this company."

By § 17 "this act is hereby declared to be a public act, and may be amended by any subsequent Legislative Assembly, in any manner not destroying or impairing the vested rights of said corporation."

By the amendatory act passed by the legislature of the State of February 28, 1865, c. 4, Special Laws of 1865, page 27, such corporation (§ 3, amendatory of original § 12) was authorized "to connect with or adopt as its own . . . any other railroad running in the same general direction with either of its main lines or any branch roads, and which said corporation is authorized to construct;" (§ 8) "to consolidate the whole or any portion of its capital stock with the capital stock or any portion thereof of any other road . . . having the same general direction or location, or to become merged therein by way of substitution;" the further right (§ 9) to consolidate any portion of its road and property with the franchise of any other railroad company or any portion thereof, and (§ 12) to consolidate the whole or any

portion of its main line or branches with the rights, powers, franchises, grants and effects of any other railroad.

It is alleged in the bill and admitted by the answer that these several acts, with their rights, privileges and franchises, were duly accepted, and that the same have ever since remained in full force and effect; that prior to 1880, the company constructed and put into operation that portion of its line which extended from St. Cloud eastwardly to the town of Hinckley, in the State of Minnesota, and that in 1889 it changed its name to the Great Northern Railway Company, which name it has ever since borne and now bears; that by various purchases, consolidations and leases, it now operates and controls all the lines of the Great Northern Railway Company extending from St. Paul and Duluth in the State of Minnesota, and from Superior in the State of Wisconsin, across the States of Minnesota, North Dakota, Montana and Idaho, to the towns of Everett and Seattle in the State of Washington, with many branch and connecting lines, none of which, however, reach Tacoma in the State of Washington, Portland in the State of Oregon, or Winnipeg in the Dominion of Canada. All of these different lines comprise an aggregate mileage of nearly forty-five hundred miles, and are operated as a combined railway system, under the name of the Great Northern Railway.

The Northern Pacific Railroad Company is a corporation organized and existing under certain acts and resolutions of Congress, and owns some, and through its receivers, controls and operates all the lines of the Northern Pacific Railroad system, extending from St. Paul in Minnesota, and from Ashland in Wisconsin to Tacoma in the State of Washington, and Portland in the State of Oregon, with many branches. and connecting lines, one of which extends to Winnipeg in Canada; that the aggregate mileage of the Northern Pacific system is nearly forty-five hundred miles, and some of the lines of each of these systems are parallel to and some competing with the lines of the other system; that the Northern Pacific Railroad Company is insolvent, its road in the hands of receivers appointed by the court at the instance of the

bondholders under the second, third and consolidated mortgages. The trustee for these bondholders has commenced suits to foreclose these mortgages, and the receivers are in possession under appointment in these foreclosure suits.

The defendant and the holders of a majority of the outstanding bonds of these mortgages of the Northern Pacific Railroad Company have entered into an arrangement or agreement by which the property shall be sold to a committee of the bondholders, who are to organize a new corporation, subject to the prior mortgages, which shall issue its bonds to the aggregate amount of $100,000,000, or more; payment of which is to be guaranteed by the Great Northern, and capital stock to the further amount of one hundred millions, one half of which is to be transferred to the shareholders of the Great Northern, and shall enter into a traffic contract with it, whereby in substance the two companies shall thereafter exchange traffic at all intersecting and connecting points, and divide the common earnings from such exchanged traffic on the basis of miles hauled on the systems respectively. This arrangement is fully set forth in the answer, a copy of which in that particular is printed in the margin.[1]

---

[1] (1.) The holders of the said several classes of bonds shall obtain a decree of foreclosure in said actions and for the sale of the railroad properties and franchises of the Northern Pacific Railroad Company, including its franchises to be a corporation, subject to the said divisional and general first mortgages mentioned in paragraph ten of the bill, and shall cause the same to bid in and be purchased by a committee of bondholders or their agents for the benefit of all the holders of said outstanding bonds secured by the mortgages so foreclosed, and shall cause a reorganization of the said railway franchises and property as a new corporation, either under the said acts and joint resolutions of Congress relating to the Northern Pacific Railroad Company or under some other proper and sufficient legislation of the United States, or of some one or more States.

(2.) Upon such foreclosure sale and reorganization the reorganized company may issue its bonds to an amount in the aggregate of $100,000,000 or over and its full paid capital stock of $100,000,000, this defendant to guarantee, for the benefit of the holders of such bonds, the payment of the principal thereof, together with interest thereon to an amount in the aggregate of such interest, guarantee not to exceed $6,200,000 per year, which guar-

Plaintiff claims that this agreement is unlawful and in violation of the act of March 9, 1874, General Laws of Minnesota for 1874, c. 29, which provides that "no railroad corporation or the lessees, purchasers or managers of any railroad corporation shall consolidate the stock, property or franchises of such corporation with, or lease or purchase the works or franchises of, or in any way control any other railroad corporations owning or having under its control a parallel or competing line; nor shall any officer of such railroad corporation act as the officer of any other railroad corporation owning or having the control of a parallel or competing line; and the question whether railroads are parallel or competing lines shall, when demanded by the party complainant, be decided by a jury as in other civil issues;" and also because it is a violation of § 3,

---

antee shall, if required by said reorganization company, be written and executed upon the back of each of said bonds.

(3.) Among other good and valuable considerations for such guarantee, and as a compensation for the risk to the stockholders of the defendant company, which may result by reason of said guarantee in the way of a possible diversion of a portion of the earnings of the defendant to make good its guarantee, the said reorganized company shall transfer, or cause or procure to be transferred by its stockholders, to the shareholders of the defendant company, or to some person or corporation as trustee for their use, one half part of the capital stock of said reorganized company.

(4.) The Northern Pacific Company shall join with the defendant in providing reasonable and adequate facilities for an interchange of cars and traffic between their respective lines, and shall interchange traffic with defendant and operate its trains to that end upon reasonable, fair and lawful terms under joint tariffs or otherwise.

(5.) The defendant shall have the right to bill and route its traffic, passengers and freight from points on its line by way of such connections as now exist or may hereafter be constructed between said line and the Northern Pacific Company to Winnipeg, Tacoma, Portland and all points in the different States through which the line of the Northern Pacific Railroad extends and not reached by the line of this defendant.

(6.) The defendant shall have the right to make use of the depot and terminal facilities of the Northern Pacific company at Spokane Falls and other points, where such use shall be found to be convenient and economical, jointly with that company, and upon reasonable, fair and lawful terms, which shall insure to the defendant a large saving on the cost and expense which it must otherwise necessarily incur in constructing and operating depots and terminals of its own.

of the act of March 3, 1881, c. 94, of the laws of Minnesota for 1881, Gen. Laws, 109, which enacts that "no railroad corporation shall consolidate with, lease or purchase, or in any way become owner of, or control any other railroad corporation, or any stock, franchise, or rights of property thereof, which owns or controls a parallel or competing line."

Defendant answered that it had ample power to make and perform its agreement under its charter; that the true construction of the provisions of the acts of 1874 and 1881, just cited, is that they do not amend or affect its charter, and that if the opposite construction be adopted, they are void in so far as they prohibit or affect its rights to make and perform this agreement, because they are in violation of the contract clause of the Constitution.

Upon the other hand, plaintiff insisted that the right to so amend the charter of the defendant, as to prohibit the performance of this contract, was reserved to the State by section 17 of the act of 1856, providing that the act might be amended by any subsequent legislation, in any manner not destroying or impairing the vested rights of said corporation.

The case was first submitted to the court upon motion for injunction, which was denied, and again upon a final hearing upon bill and answer; and the court, for the reasons stated in the opinion upon the motion for injunction, entered a decree dismissing the bill. Whereupon the plaintiff appealed to this court.

*Mr. Henry J. Horn* for appellant.

*Mr. H. W. Childs,* Attorney General of the State of Minnesota, for that State.

*Mr. M. D. Grover, Mr. Cushman K. Davis, Mr. F. B. Kellogg,* and *Mr. C. A. Severance* for appellee.

I. The agreement, so far as it relates to an interchange of traffic, to a joint use of tracks and terminals and to through billing and routeing of traffic from points on the line of appellee to points on the line of the Northern Pacific Railroad Com-

pany, not reached by its line, is valid. It is authorized by express provisions of the acts constituting appellee's charter and is in accord with public policy.

Section 3 of the Interstate Commerce Act provides: "Every common carrier, subject to the provisions of this act, shall, according to their respective powers, afford all reasonable, proper and adequate facilities for an interchange of traffic between their respective lines."

Chap. 108, Laws of 1893, State of Minnesota, provides: "All railway companies doing business in this State shall, upon the demand of any person or persons, establish reasonable joint through rates for the transportation of freight between points on their respective lines within the State. Car load lots shall be transferred without unloading in the cars in which such shipments are made, unless such loading shall be done without charge therefor to the shipper or receiver." See *Stewart* v. *Erie & Western Transportation Co.*, 17 Minnesota, 372; *Oregon Short Line* v. *Northern Pacific Railroad*, 61 Fed. Rep. 158; *Oregon Short Line* v. *Northern Pacific Railroad*, 51 Fed. Rep. 465.

The proposed guaranty is not an accommodation promise, or a loan of credit, but is an agreement to meet a legal obligation upon conditions, or to pay a debt, or to satisfy a liability. The rule is well established that such a guaranty is valid if based upon a valuable consideration, and the guarantor has the right to invest in it. *Zabriskie* v. *Cleveland, Columbus & Cincinnati Railroad*, 23 How. 381; *Green Bay & Minnesota Railroad* v. *Union Steamboat Co.*, 107 U. S. 98; *Pittsburg, Cincinnati &c. Railway* v. *Keokuk & Hamilton Bridge Co.*, 131 U. S. 371; *Fort Worth City Co.* v. *Smith Bridge Co.*, 151 U. S. 294; *Harrison* v. *Union Pacific Railroad*, 13 Fed. Rep. 522; *Tod* v. *Kentucky Union Land Co.*, 57 Fed. Rep. 47; *Leavenworth* v. *Chicago &c. Railway*, 134 U. S. 688; *Kent* v. *Quicksilver Mining Co.*, 78 N. Y. 159; *Rodgers Works* v. *Southern Railroad Association*, 34 Fed. Rep. 278; *Railroad Co.* v. *Howard*, 7 Wall. 392; *Low* v. *Central Pacific Railroad*, 52 California, 58.

II. The agreement, so far as it relates to a transfer of one

half the full paid stock of the new or reorganized company, by the stockholders of such company, to the stockholders of appellee, is not forbidden by any law of the State. Appellee does not acquire the legal title to the stock, and by such transfer of stock it does not acquire the ownership or control, of the new or reorganized company. See *Pullman's Palace Car Co.* v. *Missouri Pacific Railway*, 115 U. S. 587, where a construction was given to the word "control" such as we contend for.

III. If the legal effect of the agreement, taken as an entirety, is to give to appellee the control of the new or reorganized company, it is authorized by the acts constituting its charter to execute the agreement and acquire such control.

(1) It has such authority under the provisions of the act of March 1, 1856, giving it power to become part owner of a railroad, or to adopt a railroad as its own, and to acquire the right to the sole or joint use of a railroad.

(2) It has such authority under the provisions of the act of February 28, 1865, giving it the right to consolidate its stock and property with the stock and property of another railroad company, either within or without the State.

IV. The appellee having power under its charter and under the facts disclosed in the record, to execute the agreement, such right was not taken away by the state laws of 1874 and of 1881.

V. An accepted act of incorporation of a private corporation is a contract between the State and the corporation. Where the charter consists of a series of acts, each act which confers new and valuable powers and franchises is a contract between the State and the corporation. Any law of the State, which impairs or destroys any valuable franchise granted by such act, violates section ten, article one, of the Constitution of the United States, which provides that no State shall pass any law impairing the obligations of a contract, and is, therefore, inoperative, unless a right to modify, impair, or destroy such franchise is expressly reserved. A right to become owner of the railroad of another company, or to adopt it, or to become the owner of the stock of another company; or to

consolidate with, or acquire the control of such company, is a valuable franchise and property right, which becomes. vested immediately upon the acceptance of the acts by which the right is granted. See *Dartmouth College case,* 4 Wheat. 518; *Branch* v. *Jesup,* 106 U. S. 468; *Piqua Bank* v. *Knoop,* 16 How. 369; *Monongahela Navigation Co.* v. *United States,* 148 U. S. 312; *Wilmington Railroad* v. *Reid,* 13 Wall. 264;. *The Binghamton Bridge,* 3 Wall. 51; *Boston & Lowell Railroad* v. *Salem & Lowell Railroad,* 2 Gray, 1.

VI. A charter contract not containing a reservation on the part of the State of a right to alter or amend cannot be impaired by subsequent legislation. A right may be reserved by the State to alter, amend or repeal a charter contract. In such case vested rights may be impaired or annulled. Not vested rights in property, or contract acquired by user of corporate powers and franchises, but rights vested in the corporation by the terms of the charter contract, being part of the contract of incorporation. The distinction between the rights of property, acquired under an exercise of corporate powers and franchises, and which are protected under the Fourteenth Amendment of the Constitution of the United States, and rights given by contract, and which are protected under article one of section ten of the Constitution, is apparent. See *Tomlinson* v. *Jessup,* 15 Wall. 454; *Hamilton Gas Light Co.* v. *Hamilton,* 146 U. S. 258; *Greenwood* v. *Freight Co.,* 105 U. S. 13; *Bridge Co.* v. *United States,* 105 U. S. 470.

A charter contract may contain a limited reservation of a right to alter or impair powers, rights, and franchises granted by it. In such case it is the contract that may be altered or amended, and vested rights growing out of an acceptance of the contract may be impaired. In this case we have a reservation of a right to amend, "in any manner not destroying the vested rights of the corporation." The vested rights of the corporation were the rights, privileges and franchises which it acquired on its acceptance of the acts constituting its charter. By such acceptance the corporation acquired a right to hold and convey property, real or personal, necessary to carry

into effect the object and purpose of the corporation ; . . .
the right to construct railroads, main and branch lines ; . . .
the right to become part owner of, or to adopt as its own, the
railroad of another company ; . . . the right to acquire
the sole or joint use of the railroad of another company ; . . .
the right to consolidate its stock, its railroad, property, effects
and franchises with the stock, property, effects and franchises
of any other railroad company, either within or without the
State.

If the proposed arrangement had been made prior to the
passage of the act of 1874, it is not contended that under the
right reserved to amend, the State could have lawfully annulled
such contract of consolidation, or have deprived appellee of
any right acquired under it. In such case it is conceded the
right would have become vested, and thus could not have been
impaired. It is claimed that only rights of property and other
derivative rights, which have been acquired by user, under
the acts constituting the charter, are vested rights within the
meaning of the words as used in section 17 of the act of 1856 ;
but this is not so. It is not the user that gives the right or
franchise. It is the franchise which authorizes the user. The
distinction between rights of property, which are protected as
vested rights, because they are property rights, and a contract
right, and obligation, in the form of powers, privileges and
franchises granted by an act of incorporation, seems very apparent.

A reservation of a right to amend without words of limitation, gives a right to amend the charter, in any manner the
State may deem expedient. It is the contract that in such
case is subject to amendment. Here we have words of limitation, "may amend in any manner not impairing or destroying
the vested rights of the corporation." Are not the negative
words to stand as the controlling language ?

In construing these words we should look at the condition
of the country when the acts were passed. There was no
railroad within 300 miles of the legislature that passed the
act of 1856, and there was no hope of settlement until a railroad should reach there. Under such circumstances, the leg-

islature was willing to grant large and valuable franchises and privileges, to induce the investment of capital for the construction of railroads. It offered to appellee all the rights, franchises and privileges contained in the act of March 1, 1856. It intended that all such rights should be secure against amendment in such a way as to impair or destroy them by subsequent legislation.

Many questions that have since been solved were, at that time, not thought of; limitations that have since been imposed upon corporations were not considered. Nine years passed, but no railroad had been built. Then the State amended the original charter contract, and offered the amendment to the corporation, thus giving to it new and very valuable privileges and franchises. The court had, prior to that time, decided that every valuable privilege given by a charter, and which induced to its acceptance, was a contract which could not be changed by the legislature unless there was a reserved power to do so. The conclusion, as the court below held, "is irresistible that they meant that they would never so amend that charter as to impair or destroy any franchise or rights of the corporation which the courts had declared vested as soon as the corporate act was accepted."

The words of limitation are controlling. If necessary to preserve the limitation, the word "amend" must be disregarded. If not controlling they are without meaning.

But the word "amend" may be preserved and given force, although the right to amend is limited, as expressed in the section under consideration. The legislature might have made the grant without reserving any right. It could have reserved the full right of amendment or repeal. It adopted a third course. It reserved a right to amend, but not so as to take away or impair any right given by contract to be amended. What is it that the legislature may amend? It is the contract between the State and the corporation. How may it amend this contract? The answer is, in any and all respects not in any way destroying or impairing any right given by the terms of the contract to the corporation. In a charter where there is no reservation of right to amend, no

amendment can be made in any matter affecting the nature of the enterprise or making an increase of liability or duty without the consent of all the stockholders.   The word "amend" then has force as a part of the contract under which the State may offer additional privileges, in its interests, that can be accepted by the corporation through the vote of a mere majority of its stockholders, and that cannot be rejected by the dissent of a single share.   It has been held that where there is no reserved right, such changes cannot be made without the consent of every stockholder.

VII. The right of consolidation of stock and property is clearly granted to appellee by the act of February 28, 1865. This right is not limited to the line from Minneapolis via St. Cloud to Lake Superior, but extends to all branch lines which appellee is authorized to construct.   This act and the act of March 1, 1856, are not to be treated as one act.   It grants new franchises and powers ; and, upon its acceptance, became a new and independent contract as respects all such new franchises and powers.

Mr. JUSTICE. BROWN, after stating the case, delivered the opinion of the court.

This case turns upon the question whether the right given by its charter to the Minneapolis and St. Cloud Railroad Company to connect with any railroad running in the same general direction, and, by a subsequent amendatory act, to consolidate its capital stock, or its property, road or franchise with those of any other railroad, could be taken away by a subsequent act inhibiting the consolidation, lease or purchase by any railroad of the stock, property or franchise of any parallel or competing line.   A different question would have been presented if any such contract had been made and carried into effect, before the act of 1874 was passed, since it might be claimed that the rights of the parties had become vested, within the meaning of section 17 of the original charter of the Minnesota and St. Cloud Railroad, and as such could not be destroyed or impaired by subsequent legislation, without infringing upon

that provision of the Constitution inhibiting state legislation impairing the obligation of contracts. The case then involves indirectly the meaning of the words "vested rights," when used in the charter of railroads and other similar corporations.

1. The whole doctrine of vested rights as applied to the charters of corporations is based upon the *Dartmouth College case*, 4 Wheat. 518, in which the broad proposition was laid down that such charters were contracts within the meaning of the Constitution, and hence that an act of the state legislature altering a charter in any material respect was unconstitutional and void. The doctrine of this case has been subjected to more or less criticism by the courts and the profession, but has been reaffirmed and applied so often as to have become firmly established as a canon of American jurisprudence. The precise point decided was this : By the original charter from the Crown, granted in the year 1769, twelve persons, therein named, were incorporated by the name of "The Trustees of Dartmouth College," and there was granted to them and their successors the usual corporate privileges and powers, among which was authority to govern the college, and fill all vacancies which might be created in their own body. By an act of the legislature of New Hampshire passed in 1816, the charter was amended, the number of trustees increased to twenty-one, the appointment of the additional members vested in the executive of the State, and a board of overseers, consisting of twenty-five persons, created, with power to inspect and control the most important acts of the trustees. The president of the senate, the speaker of the house of representatives of New Hampshire, and the governor and the lieutenant governor of Vermont, for the time being, were to be members *ex officio ;* and the board was to be completed by the governor and council of New Hampshire, who were also empowered to fill all vacancies which might occur. A majority of the trustees of the college refused to accept this amended charter, and brought suit for the corporate property, which was in possession of a person holding by authority of the acts of the legislature.

The opinion contained an exhaustive discussion of the whole

subject of corporate rights and their impairment by state legislation, and probably contributed as much as any he ever delivered to the great reputation of Chief Justice Marshall. The proposed legislation of the State was fundamental in its character. On the part of the Crown it was expressly stipulated that the corporation thus constituted should continue forever; and that the number of trustees should consist of twelve and no more. By the act of the legislature the trustees were increased to twenty-one, the appointment of the additional number given to the executive of the State, and a board of overseers, twenty-one out of twenty-five of whom were also appointed by the executive of the State, was created and invested with power to inspect and control the most important acts of the trustees. Thus, said Mr. Chief Justice Marshall, " the whole power of governing the college is transferred from trustees, appointed according to the will of the founder, expressed in the charter, to the executive of New Hampshire." If this legislation was valid, Dartmouth College, as it was originally incorporated, ceased to exist, and a new institution of learning was created, which was put completely at the mercy of the state legislature. It was not the case of an amendment in an unimportant particular — the taking away of a non-essential feature of the charter, but a radical and destructive change of the governing body — a transfer of its power to the executive of the State, and virtually a reincorporation upon a wholly different basis.

Subsequent cases have settled the law that, wherever property rights have been acquired by virtue of a corporate charter, such rights, so far as they are necessary to the full and complete enjoyment of the main object of the grant, are contracts, and beyond the reach of destructive legislation. Even before the Dartmouth College case was decided, it was held by this court that grants of land made by the Crown to colonial churches were irrevocable, and that property purchased by, or devised to them, prior to the adoption of the Constitution, could not be diverted to other purposes by the States which succeeded to the sovereign power of the colonies. *Terrett* v. *Taylor*, 9 Cranch, 43; *Town of Pawlet* v. *Clark*, 9 Cranch,

292; *Society for Propagation of the Gospel* v. *New Haven*, 8 Wheat. 464.

Indeed, the sanctity of charters vesting in grantees the title to lands or other property has been vindicated in a large number of cases. *Davis* v. *Gray*, 16 Wall. 203; *Fletcher* v. *Peck*, 6 Cranch, 87, 137; *Moore* v. *Robbins*, 96 U. S. 530; *United States* v. *Schurz*, 102 U. S. 378; *Noble* v. *Union River Logging Railroad*, 147 U. S. 165.

This court has had, perhaps, more frequent occasion to assert the inviolability of corporate charters in cases respecting the power of taxation than in any other, and in a long series of decisions has held that a clause imposing certain taxes in lieu of all other taxes, or of all taxes to which the company or stockholders therein would be subject, is impaired by legislation raising the rate of taxation, or imposing taxes other than those specified in the charter. Thus in *State Bank of Ohio* v. *Knoop*, 16 How. 369, it was held that, where, by a general banking law, it was provided that a certain percentage of dividends should be set off for the use of the State, and should be in lieu of all taxes to which the company or stockholders therein would otherwise be subjected, this was a contract fixing permanently the amount of taxation, and that legislation could not thereafter increase it. In this connection it was said by Mr. Justice McLean : " Every valuable privilege given by the charter, and which conduced to an acceptance of it and an organization under it, is a contract which cannot be changed by the legislature where the power to do so is not reserved in the charter. The rate of discount, the duration of the charter, the specific tax agreed to be paid, and other provisions essentially connected with the franchise, and necessary to the business of the bank, cannot, without its consent, become a subject for legislative action." To the same effect are *New Jersey* v. *Wilson*, 7 Cranch, 164; *Gordon* v. *Appeal Tax Court*, 3 How. 133; *Dodge* v. *Woolsey*, 18 How. 331; *Jefferson Branch Bank* v. *Skelly*, 1 Black, 436; *McGee* v. *Mathis*, 4 Wall. 143; *Home of the Friendless* v. *Rouse*, 8 Wall. 430; *Wilmington Railroad* v. *Reid*, 13 Wall. 264; *Humphrey* v. *Pegues*, 16 Wall. 244; *Farrington* v. *Tennessee*, 95 U. S. 679;

*New Jersey* v. *Yard*, 95 U. S. 104; *Asylum* v. *New Orleans*, 105 U. S. 362. If, however, the charter contain a reservation of an unlimited power to alter, amend or repeal, the legislature may take away an immunity from taxation. *Tomlinson* v. *Jessup*, 15 Wall. 454.

Within the same principle are grants of an exclusive right to supply gas or water to a municipality, or to occupy its streets for railway purposes. *New Orleans Gas Co.* v. *Louisiana Light Co.*, 115 U. S. 650; *New Orleans Water Works* v. *Rivers*, 115 U. S. 674; *Louisville Gas Co.* v. *Citizens' Gas Co.*, 115 U. S. 683; *St. Tammany Water Works* v. *New Orleans Water Works*, 120 U. S. 64; *Boston & Lowell Railroad* v. *Salem & Lowell Railroad*, 2 Gray, 1.

So, if a company be chartered with power to construct and maintain a turnpike, erect toll-gates and collect tolls, such franchise is protected by the Constitution. *Turnpike Co.* v. *Illinois*, 96 U. S. 63; *Monongahela Navigation Co.* v. *United States*, 148 U. S. 312.

If it be provided in the charter of a bank that the bills and notes of the institution shall be received in payment of taxes or of debts due to the State, such undertaking on the part of the State constitutes a contract between the State and holders of the notes, which the State is not at liberty to break, although notes issued after the repeal of the act are not within the contract, and may be refused. *Woodruff* v. *Trapnall*, 10 How. 190; *Paup* v. *Drew*, 10 How. 218; *Furman* v. *Nichol*, 8 Wall. 44; *Keith* v. *Clark*, 97 U. S. 454; *Antoni* v. *Greenhow*, 107 U. S. 769; *Poindexter* v. *Greenhow*, 114 U. S. 270. And in *Planters' Bank* v. *Sharp*, 6 How. 301, where a bank was chartered with the usual powers to receive money on deposit, discount bills of exchange and notes, and to make loans, and in the course of its business the bank discounted and held promissory notes, and the legislature then passed a law declaring that it should not be lawful for any bank to transfer, by indorsement or otherwise, any note, bill receivable or other evidence of debt, it was held that the statute conflicted with the Constitution and was void. It was said in this case that " a power to dispose of its notes, as well as other property,

may well be regarded as an incident to its business as a bank to discount notes, which are required to be in their terms assignable, as well as an incident to its right of holding them and other property, when no express limitation is imposed upon the power to transfer them."

In each of the above cases, however, the title to property had either become vested in the grantee by operation of law, or the exercise of the power granted was so far necessary to the full enjoyment of the main object of the charter that persons subscribing to the stock might be presumed to take into consideration, and be influenced in their subscriptions, by the fact that the corporation was endowed with those privileges during the continuance of the charter.

2. Such limitations, however, upon the power of the legislature must be construed in subservience to the general rule that grants by the State are to be construed strictly against the grantees, and that nothing will be presumed to pass except it be expressed in clear and unambiguous language. As was said by Mr. Justice Swayne in *Fertilizing Co.* v. *Hyde Park*, 97 U. S. 659, 666 : "The rule of construction in this class of cases is that it shall be most strongly against the corporation. Every reasonable doubt is to be resolved adversely. Nothing is to be taken as conceded but what is given in unmistakable terms, or by an implication equally clear. The affirmative must be shown. Silence is negation, and doubt is fatal to the claim. This doctrine is vital to the public welfare. It is axiomatic in the jurisprudence of this court."

Hence, an exclusive right to enjoy a certain franchise is never presumed, and unless the charter contain words of exclusion, it is no impairment of the grant to permit another to do the same thing, although the value of the franchise to the first grantee may be wholly destroyed. This principle was laid down at an early day in the case of the *Charles River Bridge* v. *Warren Bridge*, 11 Pet. 420, and has been steadily adhered to ever since. *Turnpike Company* v. *The State*, 3 Wall. 210 ; *Providence Bank* v. *Billings*, 4 Pet. 514 ; *Pennsylvania Railroad* v. *Miller*, 132 U. S. 75. If however there be an exclusive provision, as, for instance, in the charter of

a bridge company that it shall not be lawful for any person to erect another bridge within a certain distance of the bridge authorized, this constitutes an inviolable contract. *The Bing-hampton Bridge*, 3 Wall. 51. But even in such cases, if the second charter be for a similar franchise, but to be exercised in a substantially different manner, the exclusive right conferred by the first charter is held not to be violated; as, for instance, if the first charter be for an ordinary bridge, and the second for a railway viaduct, impossible for man or beast to cross, except in railway cars. *Bridge Proprietors* v. *Hoboken Co.*, 1 Wall. 116. So, if the first franchise be for the sole privilege of supplying a city with water from a designated source, it is not impaired by a grant to another party of the privilege to supply it with water from a different source. *Stein* v. *Bienville Water Supply Co.*, 141 U. S. 67.

Upon a similar principle it was held in *Tucker* v. *Ferguson*, 22 Wall. 527, that a tax upon lands owned by a railway company and not used, nor necessary, in working the road and in the exercise of its franchise, was not unlawful, though the charter had provided for a certain tax upon the railroad company, and had enacted that such tax should be in lieu of all other taxes to be imposed within the State. See also *West Wisconsin Railway* v. *Supervisors*, 93 U. S. 595.

Nor does it follow, from the fact that the contract evidenced by the charter cannot be impaired, that the power of the legislature over such charter is wholly taken away, since statutes which operate only to regulate the manner in which the franchises are to be exercised, and which do not interfere substantially with the enjoyment of the main object of the grant, are not open to the objection of impairing the contract.

A familiar instance of this class of legislation is that enacted under what is known as the police power. In virtue of this the State may prescribe regulations contributing to the comfort, safety and health of passengers, the protection of the public at highway crossings or elsewhere, the security of owners of adjacent property, by requiring the track to be fenced, and such appliances to be annexed to the engines as shall prevent the communication of fire to neigh-

boring buildings. Cooley Prin. Const. Law, 321. This power,. as was said by Mr. Justice Miller in the *Slaughter-house cases*, 16 Wall. 36, 62, is and must be, from its very nature, incapable of any very exact definition or limitation.. " Upon it depends the security of social order, the life and health of the citizen, the comfort of existence in a thickly populated community, the enjoyment of private and social life, and the beneficial use of property." The following cases show to what extent and for what purposes this power may be exercised : *Slaughter-house cases*, 16 Wall. 36; *Fertilizing Company* v. *Hyde Park*, 97 U. S. 659; *Beer Company* v. *Massachusetts*, 97 U. S. 25; *Patterson* v. *Kentucky*, 97 U. S. 501; *Barbier* v. *Connolly*, 113 U. S. 27; *Charlotte, Columbia &c. Railroad* v. *Gibbes*, 142 U. S. 386; *Lawton* v. *Steele*, 152 U. S. 133; *Eagle Insurance Co.* v. *Ohio*, 153 U. S. 446. And so important is this power and so necessary to the public safety and health, that it cannot be bargained away by the legislature, and hence it has been held that charters for purposes inconsistent with a due regard for the public health or public morals may be abrogated in the interests of a more enlightened public opinion. *Stone* v. *Mississippi*, 101 U. S. 814; *Phalen* v. *Virginia*, 8 How. 163, 168.

In obedience to the same principle it has always been held that the legislature may repeal laws authorizing municipal subscriptions to railways, though such laws were in existence at the time the railway was chartered, and may be supposed to have influenced the promoters and stockholders of the road in undertaking its construction. And even if there has been a public vote in favor of such subscription, such vote does not itself form a contract with the railway company protected by the Constitution, the court holding that until the subscription is actually made the contract is unexecuted. *Aspinwall* v. *Daviess County*, 22 How. 364; *Wadsworth* v. *Supervisors*, 102 U. S. 534; *Norton* v. *Brownsville*, 129 U. S. 479; *Concord* v. *Portsmouth Savings Bank*, 92 U. S. 625; *Falconer* v. *Buffalo & Jamestown Railroad*, 69 N. Y. 491; *Covington & Lexington Railroad* v. *Kenton County Court*, 12 B. Mon. 144; *Wilson* v. *Polk County*, 112 Missouri, 126.

The contract protected by this clause must also be founded upon a good consideration. If it be a mere nude pact, a bare promise to allow a certain thing to be done, it will be construed as a revocable license. Thus, in *Christ Church* v. *Philadelphia County*, 24 How. 300, the legislature of Pennsylvania enacted that the property of Christ Church Hospital, so long as the same should continue to belong to the same hospital, should be and remain free from taxation. In 1851 they enacted that all property then exempted from taxation, other than that which was in the actual use and occupation of such association, should thereafter be subject to taxation. It was held that the original concession of the legislature exempting the property from taxation was spontaneous, and no service or duty or other remunerative consideration was imposed upon the corporation, and hence that it was in the nature of a privilege or license, which might be revoked at the pleasure of the sovereign.

In *Turnpike Company* v. *Illinois*, 96 U. S. 63, the original charter of the company gave it the right, in consideration of building a turnpike, to erect toll-gates and exact toll for twenty-five years from the date of the charter. In 1861, when the term of charter had more than half expired, the State gave the company a new and additional privilege of using a certain bridge and dyke and of erecting a toll-gate thereon. The only consideration required was that the company should keep them in repair. No term was expressed for the enjoyment of the privileges, and no conditions were imposed for resuming or revoking it on the part of the State. It was held that it could not be presumed to have been intended as a perpetual grant, since the company itself had but a limited period of existence, and that a law resuming possession of the bridge and dyke by subjecting them to the control and management of the city of East St. Louis was not a law impairing the obligation of the contract.

In *Philadelphia & Grays Ferry Co.'s Appeal*, 102 Penn. St. 123, it was also held that a supplement to a charter which merely conferred upon the corporation a new right (as an exclusive right to use and occupy certain streets) or enlarged an

old one, without imposing any additional burden upon it, was a mere license or promise by the State, and might be revoked at pleasure. " It is without consideration to support it and cannot bind a subsequent legislature."

We have epitomized these cases, not because they have any decisive bearing upon the question at issue, but for the purpose of showing the general trend of opinion in this court upon the subject of corporate charters and vested rights.

3. Conceding that there are no authorities directly in point, (and the diligence of counsel has failed to cite us to any,) let us see how far these principles are applicable to the case under consideration.

The Great Northern Railway was originally chartered in 1856, under the name of the Minneapolis and St. Cloud Railroad Company, with authority to build a road from Minneapolis, in a northerly direction, to St. Cloud on the Mississippi River, a distance of about seventy-five miles, with an additional line to a point at or near the mouth of the St. Louis River (now Duluth) on Lake Superior, about one hundred and eighty miles, and with a right to connect its road by branches with the road of any railroad company in the Territory, to become the part owner or lessee of any such railroad and to connect its road with the road of such company, and also to connect with any railroad running in the same direction. This power evidently refers to traffic connections at the termini of the road with other roads running in the same direction, in such manner as to make a continuous line, of which the road in question was to become a part. At this time railway construction west of the Mississippi River was in its infancy; no road existed within two hundred miles of St. Paul; the State was largely a wilderness, and the object of the charter was evidently to connect two cities upon the Mississippi River, one of which was situated some distance above the head of navigation, and also to connect the Mississippi with a port upon Lake Superior, with the possibility that other roads might be constructed further up the river, or in an easterly or westerly direction into the interior. The road was a local one, and while power was given to make traffic connections with other roads, none

such was given to consolidate with them — much less with roads having a parallel line. Nor is the act claimed as authorizing the proposed contract.

To save any possible doubt as to the scope of the charter the act was declared by section 17 " to be a public act, and may be amended by any subsequent Legislative Assembly, in any manner not destroying or impairing the vested rights of said corporation."

Nothing appears to have been done under this charter prior to 1865, when it was amended by reënacting its first section, thereby legalizing and confirming the original organization of the road, and amending section 12 so far as to authorize the corporation " to connect with, or adopt as its own . . . any other railroad running in the same general direction with either of its main lines or any branch roads, which said corporation is authorized to construct." Another section (8) was added, authorizing the company " to consolidate the whole or any portion of its capital stock with the capital stock or any portion thereof of the road or branch road of any other railroad corporation or company having the same general direction or location, or to become merged therein by way of substitution," etc. And further, by section 9, " to consolidate any portion of its road and property, and each branch being organized as aforesaid, may consolidate any portion of its branch road or property with the franchise of any other railroad company or any portion thereof," as might be agreed. And still further, section 12, " to consolidate the whole or any portion of its main line or branch railroads, and all the property, rights, powers, franchises, grants and effects pertaining to such roads, with the rights, powers, franchises, grants and effects of any other railroad company, either within or without the State," etc., as might be agreed. It will be observed that the words in original section 12 as amended and in section 8, limiting the power to connect with or consolidate with other roads, to those having " the same general direction or location " are omitted in sections 9 and 12.

Under these very broad and practically unlimited powers, the company, which, in 1889, took the name of the Great

Northern, proceeded, by a series of consolidations, purchases and leases, to extend its line to the Pacific Ocean, and absorb to itself and operate as a combined system an aggregate length of 4500 miles. It is now proposed, by an arrangement with the bondholders and contemplated purchasers of the Northern Pacific Railway Company, that the Great Northern Railway, the defendant, shall guarantee, for the benefit of the holders of the bonds to be issued by the reorganized company, the payment of the principal and interest upon such bonds, and as a consideration for such guaranty, and as a compensation for the risk to the stockholders, the reorganized company shall transfer to the shareholders of the defendant company, or to a trustee for their use, one half of the capital stock of the reorganized company. By a further provision, the Northern Pacific is to join with the defendant in providing facilities for an interchange of cars and traffic between their respective lines, and shall interchange traffic with the defendant, and operate its trains to that end upon reasonable, fair and lawful terms under joint tariffs or otherwise, the defendant having the right to bill its traffic, passengers and freight from points on its own line to points on the Northern Pacific not reached by the Great Northern, with the further right to make use of the terminal facilities of the Northern Pacific at points where such facilities would be found to be convenient and economical, jointly with that company.

As the Northern Pacific road also controls, by its own construction and by the purchase of stock, other roads extending from the Mississippi River to the Pacific Ocean, and operates as a single system an aggregate mileage of 4500 miles, most of which is parallel to the Great Northern system, the effect of this arrangement would be to practically consolidate the two systems, to operate 9000 miles of railway under a single management, and to destroy any possible advantages the public might have through a competition between the two lines.

It is true that upon its face the agreement contemplates principally an interchange of traffic between the lines under joint tariffs, (by which is probably meant similar rates to be agreed upon between the parties,) in order that the defendant

may enjoy the right to ticket its passengers and consign its freight to points upon the line of the Northern Pacific, not reached by the Great Northern, and to that end is also to have the right to make use of the terminal facilities of the Northern Pacific at such points on the line as should be convenient to the defendant. If the sole object of this agreement were to facilitate an interchange of traffic, so that each road might enjoy the benefit of billing its passengers and freight to points on the other road, not reached by it, it would be difficult to foresee any objection to it. But the fact that one half of the capital stock of the reorganized company is to be turned over to the shareholders of the Great Northern, which is, in turn, to guarantee the payment of the reorganized bonds, is evidence of the most cogent character to show that nothing less than a purchase of a controlling interest, and practically the absolute control, of the Northern Pacific is contemplated by the arrangement. With half of its capital stock already in its hands, the purchase of enough to make a majority would follow almost as a matter of course, and the mastership of the Northern Pacific would be assured.

That the transfer of stock is to be made, not directly to the company, but to the shareholders, is immaterial, since it may be assumed that they would cast their votes in the interests of the company. Either the stock so transferred becomes virtually the property of the Great Northern, or there is no consideration for its guaranty of the principal and interest of the consolidated bonds. But as, by the agreement, the guaranty by the defendant of the Northern Pacific bonds is assumed to be in consideration of a transfer to its stockholders of one half the capital stock of the reorganized company, it would inevitably follow that this stock would be held for the benefit of the company. There is, however, in addition to that, an alternative provision that the transfer may be made to a trustee for the use of the stockholders, who would of course act as their agent and represent them as a body, and in fact stand as the company under another name. Doubtless these stockholders could lawfully acquire by individual purchases a majority, or even the whole of the stock of the reorganized

Opinion of the Court.

company, and thus possibly obtain its ultimate control; but the companies would still remain separate corporations with no interests, as such, in common. This, though possible, would not be altogether feasible, and would require considerable time for its accomplishment. In a few years the two companies might by sales of the stock, so acquired, become completely dissevered, and the interests of the stockholders of each company thus become antagonistic. Under the proposed arrangement, however, the Northern Pacific as a company, in return for a guaranty, which the individual stockholders could not give, turns over to a trustee for the entire body of stockholders of the Great Northern one half of its stock, with the almost certainty of the latter securing the complete control, and probably the ultimate amalgamation, of the two companies. If such amalgamation were once effected, it would in all probability be final. We think the proposed arrangement is a plain violation of the acts of the state legislature passed in 1874 and 1881, prohibiting railroad corporations from consolidating with, leasing or purchasing, or in any other way becoming the owner of, or controlling any other railroad corporation, or the stock, franchises or rights of property thereof, having a parallel or competing line.

Under the broad powers conferred by the amended act of 1865, it is probable that this arrangement might be lawfully made; and the question is whether an unexecuted power to make such arrangement is a "vested right" within the meaning of section 17 of the original act. It is possible that, if this arrangement had been actually made and carried into effect, before the acts forbidding the consolidation of parallel or competing lines had been passed, the rights of the parties thereto would have become vested, and could not be impaired by any subsequent act of the legislature. But the real question before us is whether a bare unexecuted power to consolidate with other corporations, a power which, if it exists as claimed by the defendant, would authorize it to absorb by successive and gradual accretions the entire railway system of the country, is not, so long as it remains unexecuted, within the control of and subject to revocation by the

legislature, at least, so far as it applies to parallel or competing lines.

A vested right is defined by Fearne, in his work upon Contingent Remainders, as "an immediate fixed right of present or future enjoyment;" and by Chancellor Kent as "an immediate right of present enjoyment, or a present fixed right of future enjoyment." 4 Kent Com. 202. It is said by Mr. Justice Cooley that "rights are vested, in contradistinction to being expectant or contingent. They are vested when the right to enjoyment, present or prospective, has become the property of some particular person or persons as a present interest. They are expectant, when they depend upon the continued existence of the present condition of things until the happening of some future event. They are contingent, when they are only to come into existence on an event or condition which may not happen or be performed until some other event may prevent their vesting." Principles of Const. Law, 332.

As applied to railroad corporations, it may reasonably be contended that the term extends to all rights of property acquired by executed contracts, as well as to all such rights as are necessary to the full and complete enjoyment of the original grant, or of property legally acquired subsequent to such grant. If, for example, the legislature should authorize the construction of a certain railroad, and by a subsequent act should take away the power to raise funds for the construction of the road in the usual manner by a mortgage, or the power to purchase rolling stock or equipment, such acts might perhaps be treated as so far destructive of the original grant as to render it valueless, although there might in neither case be an express repeal of any of its provisions. *Sala* v. *New Orleans*, 2 Woods, 188.

But where the charter authorizes the company in sweeping terms to do certain things which are unnecessary to the main object of the grant, and not directly and immediately within the contemplation of the parties thereto, the power so conferred, so long as it is unexecuted, is within the control of the legislature and may be treated as a license, and may be re-

voked, if a possible exercise of such power is found to conflict with the interests of the public. As applicable to the case under consideration, we think it was competent for the legislature to declare that the power it had conferred upon the Minneapolis and St. Cloud Railway Company to consolidate its interest with those of other similar corporations should not be exercised, so far as applicable to parallel and competing lines, inasmuch as it is for the interest of the public that there should be competition between parallel roads. The legislature has the right to assume in this connection that neither road would reduce its tariff to a destructive or unprofitable figure, or to a point where either road would become valueless to its stockholders, and that the object of the act in question is to prevent such a combination between the two as would constitute a monopoly.

When the act of 1865 was passed it was doubtless contemplated that the Minneapolis and St. Cloud Railway Company would desire to extend its road, (though it is hardly possible to suppose that an extension to the Pacific coast was thought of at that time,) and to build, purchase or lease branch roads, which would serve as feeders to its main line, and open up railway communication with territory naturally tributary to St. Paul and other towns on the Mississippi River. Such anticipations were perfectly legitimate, and these broad powers were undoubtedly intended as an encouragement to the construction of railways, to the development of the vast, unoccupied, but fertile, territory stretching in both directions from the course of the Mississippi River, and also to a connection with the fertile wheat-growing section of Manitoba, by a branch road to the Canadian line. Had it occurred to the legislature at that time that these almost unlimited powers would be used to obtain the control of parallel and competing lines, and to stifle legitimate competition, doubtless a proviso would have been inserted to meet this possibility. That the charter of 1865 might be made available to accomplish this purpose became apparent so soon, that, within nine years thereafter, and before the construction of the road had been fairly entered upon, the legislature declared, in its act

of March 9, 1874, that no railroad corporation should consolidate with, lease, purchase or control any parallel or competing line; and to indicate still more clearly that its object was only to prevent the abuse of these powers by the creation of a monopoly, it passed another act, in 1881, repeating this prohibition, and further declaring that any railroad corporation, whether organized under general law or special charter, might consolidate with, lease, purchase or in any way become the owner of, or control, or hold the stock of any other railroad corporation, when the respective roads could be lawfully connected and operated together, so as to constitute one continuous main line, with or without branches.

We do not deem it necessary to express an opinion in this case whether the legislature could wholly revoke the power it had given to this company to extend its system by the construction or purchase of branch lines or feeders; since the possibility of an extension of the road, even to the Pacific coast, may have had an influence upon persons contemplating the purchase of its stock or securities, so that a right to do this might be said to have become vested. But we think it was competent for the legislature, out of due regard for the public welfare, to declare that its charter should not be used for the purpose of stifling competition and building up monopolies. In short, we cannot recognize a vested right to do a manifest wrong.

Nor do we undertake to say that the legislature may not, in the exercise of a wise foresight, and for the purpose of attracting capital to enterprises of doubtful profit, authorize the granting of monopolies for a limited time, irrevocable by a subsequent legislature. To do so would practically ignore or overrule a series of cases to which we have already adverted, wherein corporations have been induced to furnish municipalities with bridges, gas, water and other requirements of modern civilization, by the promise of exclusive privileges for a term of years. Perhaps, too, it might not be beyond the competency of the legislature to authorize a railroad, by a clear and explicit act, to consolidate with a parallel or competing line, since cases may be imagined

where it might be for the public welfare to permit such consolidation. But the act of 1865, upon which the defendant relies, contains no such provision. There is only a general authority to consolidate, which we think the legislature may, by another act, declare shall not apply to cases manifestly not within its original intent. We think the general doctrine, requiring grants to corporations to be construed favorably to the public, where there is a reasonable doubt as to the extent of the privilege conferred, may properly be invoked to declare that such privileges shall not be used to the detriment of the public.

Whether the consolidation of competing lines will necessarily result in an increase of rates, or whether such consolidation has generally resulted in a detriment to the public, is beside the question. Whether it has that effect or not, it certainly puts it in the power of the consolidated corporation to give it that effect — in short, puts the public at the mercy of the corporation. There is and has been, for the past three hundred years, both in England and in this country, a popular prejudice against monopolies in general, which has found expression in innumerable acts of legislation. We cannot say that such prejudice is not well founded. It is a matter upon which the legislature is entitled to pass judgment. At least there is sufficient doubt of the propriety of such monopolies to authorize the legislature, which may be presumed to represent the views of the public, to say that it will not tolerate them unless the power to establish them be conferred by clear and explicit language. While, in particular cases, two railways by consolidating their interests under a single management, may have been able to so far reduce the expenses of administration as to give their customers the benefit of a lower tariff, the logical effect of all monopolies is an increase of price of the thing produced, whether it be merchandise or transportation. Owing to the greater speed and cheapness of the service performed by them, railways become necessarily monopolists of all traffic along their lines; but the general sentiment of the public declares that such monopolies must be limited to the necessities of the case, and rebels

against the attempt of one road to control all traffic between terminal points, also connected by a competing line. There are, moreover, thought to be other dangers to the moral sense of the community incident to such great aggregations of wealth, which, though indirect, are even more insidious in their influence, and such as have awakened feelings of hostility which have not failed to find expression in legislative acts.

The consolidation of these two great corporations will unavoidably result in giving to the defendant a monopoly of all traffic in the northern half of the State of Minnesota, as well as of all transcontinental traffic north of the line of the Union Pacific, against which public regulations will be but a feeble protection. The acts of the Minnesota legislature of 1874 and 1881 undoubtedly reflected the general sentiment of the public, that their best security is in competition.

In conclusion, we hold that where, by a railway charter, a general power is given to consolidate with, purchase, lease or acquire the stock of other roads, which has remained unexecuted, it is within the competency of the legislature to declare, by subsequent acts, that this power shall not extend to the purchase, lease or consolidation with parallel or competing lines.

The decree of the court below must therefore be

*Reversed, and the case remanded for further proceedings in conformity with this opinion.*

MR. JUSTICE FIELD and MR. JUSTICE BREWER dissented.