STATE OF MINNESOTA v. NORTHERN SECURITIES CO. et al.

(Circuit Court, D. Minnesota, Third Division. August 1, 1903.)

No. 791.

1. MONOPOLIES—COMBINATIONS IN RESTRAINT OF TRADE AND COMMERCE—MINNESOTA STATUTE.

The anti-trust law of Minnesota (Laws 1899, p. 487, c. 359), making unlawful any contract or combination in restraint of trade or commerce within the state, is in substantially the same language as the Sherman anti-trust law (Act July 2, 1890, c. 647, 26 Stat. 209 [U. S. Comp. St. 1901, p. 3200]), and must receive a similar construction. Following the decisions of the United States Supreme Court construing the latter act, the Minnesota law applies to railroads, and any contract or arrangement between railroad companies for the purpose and having the effect of preventing competition by fixing rates to be maintained by the parties is in violation of its provisions; but contracts or combinations which do not directly and necessarily affect transportation, or rates therefor, are not in restraint of trade or commerce, nor within the statute, even though they may remotely and indirectly appear to have some probable effect in that direction.

2. SAME—RAILROADS—STOCK-HOLDING CORPORATION.

A holding corporation organized by individual stockholders of two railroad companies, owning and operating substantially parallel and competing lines of railroad within the state of Minnesota, for the sole purpose of acquiring, by the exchange of its own stock therefor, stock of the two companies, and holding and voting the same, but having no power or franchise to operate a railroad, is not in violation of the Minnesota anti-trust law (Laws 1899, p. 487, c. 359), which provides that "any contract, agreement, arrangement, or conspiracy, or any combination in the form of a trust or otherwise * * * which is in restraint of trade or commerce within this state, * * * is hereby prohibited and declared to be unlawful," where the purpose of its promoters was thereby to acquire and retain in the same hands a majority of the stock of one or both companies, to insure uniformity of policy and stability of management, although it in fact acquired the controlling interest in both, in the absence of any evidence that it ever exercised its power to prevent competition between the two roads, or to interfere in any manner with the fixing of rates by either company.

3. SAME—ENFORCEMENT OF STATUTE—JURISDICTION OF EQUITY.

The anti-trust law of Minnesota (Laws 1899, p. 487, c. 359) imposes severe penalties for its violation, but contains no provision for restraining or enjoining violations, and without such statutory authority a court of equity has no jurisdiction to enjoin an act which constitutes a criminal offense.

4. RAILROADS—MINNESOTA STATUTE AGAINST CONSOLIDATION—STOCK-HOLDING CORPORATION.

The Minnesota statute prohibiting the consolidation of parallel and competing lines of railroad (Laws 1874, p. 154, c. 29, and subsequent enactments of the same tenor), which provides that "no railroad corporation or the lessees, purchasers or managers of any railroad corporation shall consolidate the stock, property or franchise of such corporation

with, or lease or purchase the works or franchise of, or in any way control any other railroad corporation owning or having under its control a parallel or competing line," does not apply to a corporation organized by individual stockholders of two companies, owning parallel and competing lines of railroad, for the sole purpose of acquiring, holding, and voting stock of the two companies, in the formation of which neither company had any part, and which has no powers or franchise as a railroad company. Such a corporation is merely an investing stockholder, and not a railroad corporation, nor a lessee, purchaser, or manager of a railroad corporation, within the terms of the statute; and, although it may acquire and own a majority of the stock of both companies, it does not thereby effect a consolidation, where the companies still maintain their separate organizations, with separate boards of directors and managing officers.

In Equity.   On final hearing.

W. B. Douglas, M. D. Munn, and Geo. P. Wilson, for complainant.
Young & Lightner, for Northern Securities Co. and J. J. Hill.
C. W. Bunn, for Northern Pacific Ry. Co.
M. D. Grover, for Great Northern Ry. Co.

LOCHREN, District Judge.   This cause came on for final hearing at St. Paul June 5, 1903, upon the bill, answers, and testimony taken and on file.   That the cause is one of equitable cognizance, and that this court has rightful jurisdiction of the same, was conceded by counsel.   The cause was fully argued, and upon full consideration the following facts appear and are established:

First. The defendant the Great Northern Railway Company is a Minnesota corporation, which has, as stated in the bill, acquired the property rights and franchises, and the management and control, of various specified railway corporations.   The defendant the Northern Pacific Railway Company is a Wisconsin corporation, which filed its articles of incorporation in Minnesota, and in 1896 purchased and acquired all the railroad properties, railway lines, right of way, rolling stock, and franchises of the earlier Northern Pacific Railroad Company, and has also, as stated in the bill, acquired the property rights and franchises and the management and control of other specified railway corporations.   The said Great Northern and Northern Pacific Companies now, and for many years, severally own, operate, and maintain a main line of railway extending from the cities of Duluth, St. Paul, and Minneapolis westward, across the states of Minnesota, North Dakota, Montana, Idaho, and Washington, to Puget Sound, with many branches along the route of each, and that said two systems of railroad are, as to each other, parallel and competing lines of railway, at least between cities and towns reached or traversed by the lines of both of said two railways, among which are Duluth, St. Paul, Minneapolis, Anoka, St.. Cloud, Moorehead, East Grand Forks, and several other towns in the state of Minnesota, and that a reasonable degree of competition for the traffic between places so situated on both said lines of railway has existed in the past years.

Second. The state of Minnesota has heretofore made large grants of its swamp lands in aid of the construction of portions of the railways of each of said companies, and, in the support of its various state institutions—educational, eleemosynary, and otherwise—transports an-

nually large quantities of goods, stores, and supplies upon said two railroads; and large quantities of wheat and other products owned and produced by citizens and inhabitants of Minnesota are annually carried over said railroads from competitive places in the western part of the state to Duluth, St. Paul, and Minneapolis.

Third. In 1874 the Legislature of the state of Minnesota enacted a statute known as chapter 29, p. 154, of the General Laws of 1874, as follows:

"Section 1. No railroad corporation, or the lessees, purchaser or manager of any railroad corporation, shall consolidate the stock, property or franchise of such corporation with, or lease or purchase the works or franchise of, or in any way control any other railroad corporation owning or having under its control a parallel or competing line; nor shall any officer of such railroad corporation act as an officer of any other railroad corporation owning or having the control of a parallel or competing line, and the question whether railroads are parallel or competing lines shall, when demanded by the party complainant, be decided by a jury as in other civil cases."

In 1881 the Legislature of Minnesota enacted a statute (Laws 1881, p. 109, c. 94) authorizing and empowering any railroad corporation, domestic or foreign, to consolidate its stock and franchises with, or lease or purchase or in any way become owner of or control the stock of any other railroad corporation when their respective railroads can be connected and operated together so as to constitute a continuous main line, with or without branches. But the same statute reiterated the prohibition against the consolidation of railroads having parallel and competing lines, and by a subsequent amendment of this statute (Laws 1899, p. 253, c. 229) the same prohibition was again enacted almost in the language of the act of 1874, above quoted. In 1899 the Legislature of Minnesota also enacted a statute known as the "Anti-trust law" (Laws 1899, p. 487, c. 359), which provided:

"Section 1. Any contract, agreement, arrangement, or conspiracy, or any combination in the form of a trust or otherwise, hereafter entered into which is in restraint of trade or commerce within this state, or in restraint of trade or commerce between any of the people of this state and any of the people of any other state or country, * * * is hereby prohibited and declared to be unlawful."

Severe penalties are denounced against all who shall violate the act, including the forfeiture of the charter of any offending corporation. And it is made the duty of the Attorney General to institute, in the name of the state, proceedings in any court of competent jurisdiction to recover the penalties imposed, and also, in the case of offending corporations, to enforce the forfeiture of their charters.

Fourth. The railroads both of the Great Northern and Northern Pacific Companies between the Missouri river and Puget Sound pass through long stretches of mountainous and unsettled or sparsely settled country, which supplies comparatively little traffic or business to these railroads. But the forests near Puget Sound produce a great supply of lumber, readily marketable east of the Missouri river, and in Iowa, Illinois, Nebraska, and Missouri. To transport it over these railroads (which in the direction of the principal markets for the lumber ended at St. Paul) at rates which would make the business practicable, it was necessary that west-bound freight should be se-

cured for the cars which would bring the lumber eastward. The Great Northern Company and Northern Pacific Company were alike interested in this business, and, acting in harmony, in the spring of 1901, purchased substantially all the shares of the Chicago, Burlington & Quincy Railway Company (each company buying and owning one-half), at $200 per share, amounting to $108,000,000, par value, the cost being about $216,000,000; paying for the same in the joint 4 per cent. bonds of the two purchasing companies. As the Burlington system so purchased has a railway extending from Minneapolis and St. Paul to Chicago, and railways covering large portions of the states of Illinois, Iowa, Missouri, and Nebraska, and connecting again with the Northern Pacific at Billings, in Montana, it, though still managed by its own directors and officers, affords to the two purchasing railroads the needed mutual extension to transport their trains of lumber to desirable markets, and to bring return traffic, in coal, iron, steel, cotton, and other commodities, needed on the route of these two railroads and on the Pacific Coast, and in the trade growing up between Puget Sound and Alaska, China, and Japan.

The Union Pacific Railway extends from Omaha to Ogden, and, by its connection with the Central or Southern Pacific, to San Francisco, with the branches and connections which reach points on the Great Northern and Northern Pacific in Montana and Washington. As the Burlington system connects with the Union Pacific at Omaha and elsewhere in Nebraska, and extends east, north, and south from Omaha, much of the freight gathered by it, bound for the Pacific Coast, passed over the Union Pacific. Hence the purchase of the Burlington system by the Great Northern and Northern Pacific, which was completed about April 1, 1901, led the managers of the Union Pacific Company to fear a diversion of this traffic from the railway of the Union Pacific to the railways of the two purchasing companies; and Edward H. Harriman, representing the Union Pacific Company, applied to James J. Hill and J. Pierpont Morgan, who respectively represented the Great Northern and Northern Pacific Companies in such purchase, to permit the Union Pacific Company to join and share with them in the purchase of the Burlington system, but his application was declined. Thereupon the said Harriman and others acting in the interest of the Union Pacific Company began rapidly and quietly to purchase the stock of the Northern Pacific Company, intending thus to acquire a majority of that stock, and the control of that company, with its half interest in the Burlington system. The common stock of the Northern Pacific Company was $80,000,000, and it had issued and had outstanding preferred stock to the amount of $75,-000,000, which had the same voting power as the common stock, but which the company, by the action of its directors, might pay off at par, and thus retire, on the 1st day of January, 1902, or on the 1st day of any succeeding year. During the month of April and first week in May, 1901, the said Harriman and others acting with him in the interest of the Union Pacific Company purchased and held a little more than $37,000,000 of the common stock, and a little more than $41,000,000 of the preferred stock, of the Northern Pacific Company; being more than $78,000,000 in all, and more than a majority of the aggregate

of the common and preferred stock of that company. But in the first week of May, 1901, J. P. Morgan & Co., becoming apprehensive, purchased $15,000,000 of the common stock of the Northern Pacific Company, which, with their previous holding of that stock, and those of Mr. Hill and other stockholders of the Northern Pacific Company, who in this matter acted with Mr. Morgan, gave the latter the control of more than $41,000,000 of such common stock; being more than a majority of that stock. As it was known that Mr. Morgan and his associates would insist upon the payment and retirement of the preferred stock on January 1, 1902, and that the board of directors of the Northern Pacific Company would take action to that end, Mr. Harriman and his associates abandoned their attempt to obtain the control of that company.

For many years, including the period of the construction of the Great Northern Company's railroad from the state of Minnesota to Puget Sound, and its branches and extensions in other directions, Mr. Hill, with the acquiescence of all the stockholders, had been the president and active manager of that company. The stock of that company aggregated $125,000,000, and he, with a small number of other holders of large amounts of that stock, had for some time considered the project of uniting their holdings of stock by transferring the same to some corporation to whom any others of the holders of such stock might transfer their holdings, and thus assure permanency to the management and policy of the company.

The attempt in the interest of the Union Pacific Company to purchase a majority of the stock of the Northern Pacific Company, and obtain the control of that company, and through it of the Burlington system, alarmed the managers and stockholders of the Northern Pacific Company, and led them to consider the feasibility of forming a holding company which should purchase or secure in exchange for its own stock more than a majority of the stock of the Northern Pacific Company, and hold the same secure against any raid in the future in the interest of a rival or hostile railroad. Mr. Hill and the stockholders referred to of the Great Northern Company were likewise alarmed by such attempt in the interest of the Union Pacific Company to obtain control of the Northern Pacific, and through it of the Burlington system—a result which they apprehended would injuriously affect the property of the Great Northern Railroad, and the country traversed by it and by the Northern Pacific Railroad; and, in the project of establishing a holding company to purchase and hold a majority of the stock of the Northern Pacific Company, they joined for the purpose of selling to such holding company, and placing therein their own stock in the Great Northern Company, and permitting all other stockholders of the same company who might so choose to do likewise, and thus accomplish their purpose above stated of giving permanency to the management and policy of the Great Northern Company.

The incorporation of the Northern Securities Company under the general laws of New Jersey, and with a capital of $400,000,000, was completed November 13, 1901. Neither the Great Northern Company nor the Northern Pacific Company, by any act of its directors, or any

corporate act, had anything to do with the formation or subsequent action of the Northern Securities Company; but Mr. Morgan, Mr. Hill, and other stockholders of the Northern Pacific Company and Great Northern Company were individually the promoters who caused and procured the incorporation of the Northern Securities Company for the purposes above stated. The Northern Securities Company, when formed, offered and agreed to purchase and to pay for in its own stock at par ($100 per share) any stock of the Northern Pacific Company at the price of $115 per share, and any stock of the Great Northern Company at the price of $180 per share; and large amounts of the stock of said two railroads were, at such rates, and so paid for, purchased from said promoters and other stockholders of said two railroad companies by said Northern Securities Company. About the same time Mr. Harriman and his associates sold to J. P. Morgan & Co. all the Northern Pacific Company stock which they had purchased as aforesaid—both common and preferred—amounting to more than $78,000,000, and said J. P. Morgan & Co. at the same time sold all the same stock to the Northern Securities Company, who paid the consideration therefor directly to Mr. Harriman and his associates; a part of such consideration being something more than $82,000,000 of the stock of said Northern Securities Company. That purchase was completed on November 18, 1901. On January 1, 1902, the Northern Pacific Company paid off and retired its preferred stock, having raised the money for that purpose by an issue of bonds, which were made convertible and were converted into common stock of that company. Other stockholders of each of said two railroad companies sold their stock to the Northern Securities Company, receiving in payment or exchange therefor, at the rates aforesaid, stock of the last-named company, so that by December 1, 1901, said Northern Securities Company had become the owner of considerable more than a majority of the stock of the Northern Pacific Company, and a large amount, but less than a majority, of the stock of the Great Northern Company. Similar purchases from stockholders continued, and at the time of the commencement of this suit the Northern Securities Company had become, and still is, the owner of about 96 per cent. of all the stock of the Northern Pacific Company, and of about 76 per cent. of all the stock of the Great Northern Company.

## Conclusions of Law.

1. It is obvious from the foregoing facts that the Northern Securities Company was incorporated with the purpose and intent on the part of its promoters that it should acquire by purchase, by exchange for its stock, and should own and control, a considerable majority of all the stock of the Northern Pacific Company, and thus secure that company against the danger of any future raid upon its stock which might place its management and the resulting control of the Burlington system in the power of any rival railroad corporation, whose interests might be hostile to the development and property of the Northern Pacific and Great Northern Companies, and their seaboard terminals, and of the region of country traversed by their railroad systems. This was the avowed purpose of Mr. Morgan and his associates who

acted with him in this matter, including Mr. Hill and other large stockholders of the Great Northern Company, who also held large amounts of stock in the Northern Pacific Company, and were apprehensive that any hostile control of the Northern Pacific Company which might sacrifice its interests to a rival would be disastrous to the development and prosperity of the Great Northern Company. And at the very time when the Northern Securities Company was formed and incorporated, by means of the large holdings of Northern Pacific Company stock by himself and his associates acting with him, and by the then purchase by J. P. Morgan & Co. of the Harriman holding of such stock, said J. P. Morgan was able at once to transfer and have transferred to the Northern Securities Company a large and controlling majority of the stock of the Northern Pacific Company, as was done; thereby accomplishing, as was believed, the purpose of securing that stock against hostile raids in the future.

With respect to the stock of the Great Northern Company, the evidence shows that, when the Northern Securities Company was incorporated, it was the purpose and intent of Mr. Hill and other large stockholders of the Great Northern Company who acted with him to sell and dispose of to the Northern Securities Company, for its stock, their several holdings of stock in the Great Northern Company, aggregating then about $35,000,000, to the end that such large amounts of Great Northern Company's stock should be kept together, and, as it was hoped, aid in giving permanency to the management and policy which had controlled and was controlling the railway and development of that company. And it was their purpose that all other stockholders of the Great Northern Company who might choose to do so should be permitted to sell or exchange their stock of that company for stock of the Northern Securities Company on the same terms, and it was hoped and expected that many would do so. But the said Hill and his associates had no power or control which could enable them to transfer or cause to be transferred to the Northern Securities Company so much as one-third of the stock of the Great Northern Company. The evidence therefore fails to show that the Northern Securities Company was formed for the purpose of acquiring and holding a majority of the stock of the Great Northern Company, as well as that of the Northern Pacific Company, although that result followed soon after, and may have been desired and anticipated.

2. One question in this cause is whether the acquisition by the Northern Securities Company, in the manner above stated, of a majority of the capital stock of both the Great Northern and Northern Pacific Companies, which own and operate parallel and competing railroads across the state of Minnesota, and its ownership of such stock, is a violation of the Minnesota anti-trust law (Laws Minn. 1889, p. 487, c. 359), which provides, as above stated, that "any contract, agreement, arrangement, or conspiracy, or any combination in the form of a trust or otherwise hereafter entered into which is in restraint of trade or commerce within this state * * * is hereby prohibited and declared to be unlawful." Language in the act extending these provisions to interstate commerce is here omitted and disregarded, and the act considered valid as to trade and commerce within the state;

that being a proper subject for state legislation, though carried on by the same instrumentalities used in interstate commerce. The language just quoted is evidently taken from the act of Congress of July 2, 1890, c. 647, 26 Stat. 209 [U. S. Comp. St. 1901, p. 3200], known as the Sherman anti-trust act, which has received consideration by the Supreme Court of the United States in several cases.

In United States v. E. C. Knight Company, 156 U. S. 1, 15 Sup. Ct. 249, 39 L. Ed. 325, a New Jersey corporation, already in control of most of the manufactories of refined sugar in the United States, purchased with shares of its own stock the stock of four Philadelphia refineries, and acquired nearly complete control of that business in the country. It was charged that the contracts under which these purchases were made constituted combinations in restraint of trade, and that by entering into them the defendants combined and conspired to restrain the trade and commerce in refined sugar among the several states and with foreign nations. Held, that though the contracts of purchase of these refineries would result in a monopoly in the manufacture of refined sugar, an article certain to enter into commerce, yet the manufacture of the article was no part of commerce, and therefore the contract had no direct relation to commerce, even though to dispose of the product the instrumentality of commerce would be necessarily invoked. The product would not enter into commerce till transportation began, and the contracts had no reference to transportation.

In United States v. Trans-Missouri Freight Association, 166 U. S. 290, 17 Sup. Ct. 540, 41 L. Ed. 1007, it was held that the Sherman anti-trust act applies to railroads, and prohibits all contracts in restraint of trade, whether reasonable or unreasonable, and also that articles of agreement by which some 17 railroad companies formed that association, in which each railroad company had a representative, empowering the association to fix reasonable rates for the transportation of freight on said railroads (many of whom were competitive), and change such rates on proper occasion, and binding the railroad companies, under penalties, to conform their charges for transportation to the rates so to be established, was a contract in violation of that anti-trust act. Plainly, the direct and only object of this agreement was its provision for the fixing, controlling, and maintaining rates for the transportation of freight over these railroads.

United States v. Joint Traffic Association, 171 U. S. 505, 19 Sup. Ct. 25, 43 L. Ed. 259, was like the case last cited. The association was formed between 31 railroad companies, engaged in transportation between Chicago and the Atlantic Coast. The association formed of representatives of the companies was given control over competitive transportation of freight and passengers, with power to fix rates, fares, and charges, and change the same from time to time; and to these rates the railroad companies bound themselves to conform. The principal difference between this case and the one last mentioned was that by the terms of this agreement the association was to co-operate with the interstate commerce commission, to secure stability and uniformity in the rates, fares, and charges established. It was held that this agreement also violated the anti-trust act.

In Hopkins v. United States, 171 U. S. 578, 19 Sup. Ct. 40, 43 L. Ed. 290, the members of the Kansas City Live Stock Exchange did business at the Kansas City Stockyards located partly in Kansas City, Kan., and partly in Kansas City, Mo., dealing on their own account, or as commission merchants in live stock shipped from surrounding states and territories, to the owners of which they often made advances before shipment. They were bound by articles of association and by-laws, which, among other things, fixed the minimum rates for commissions, forbade the giving of information of the condition of the market, except under specified circumstances, and forbade all dealing with any person who violated the rules of the exchange, or with an expelled or suspended member. Held, that the business so transacted was not commerce, although it furnished aids and facilities to interstate commerce. The court said:

"The contract condemned by the statute is one whose direct and immediate effect is a restraint upon that kind of trade or commerce which is interstate. Charges for such facilities as we have already mentioned are not a restraint upon that trade, although the total cost of marketing a subject thereof may be thereby increased. Charges for facilities furnished have been held not a regulation of commerce, even when made for services rendered or as compensation for benefits conferred. Sands v. Manistee River Improvement Company, 123 U. S. 288 [8 Sup. Ct. 113, 31 L. Ed. 149]; Monongahela Navigation Co. v. United States, 148 U. S. 312, 329, 330 [13 Sup. Ct. 622, 37 L. Ed. 463]; Kentucky & Indiana Bridge Co. v. Louisville, etc., Railroad (C. C.) 37 Fed. 567 [2 L. R. A. 289]."

In Anderson v. United States, 171 U. S. 604, 19 Sup. Ct. 50, 43 L. Ed. 300, the facts were similar to those in the Hopkins Case, last cited. The holding of the court is expressed in the syllabus as follows:

"That where the subject-matter of the agreement does not directly relate to and act upon and embrace interstate commerce, and where the undisputed facts clearly show that the purpose of the agreement was not to regulate, obstruct, or restrain that commerce, but was entered into with the object of properly and fairly regulating the transaction of the business in which the parties to the agreement were engaged, such agreement will be upheld, as not within the statute, where it can be seen that the character and terms of the agreement are well calculated to attain the purpose for which it was formed, and where the effect of its formation and enforcement upon interstate trade or commerce is in any event but indirect and accidental, and not its purpose and object."

In Addyston Pipe & Steel Company v. United States, 175 U. S. 211, 20 Sup. Ct. 96, 44 L. Ed. 136, six corporations engaged in the manufacture, sale, and transportation of iron pipe, and being located in the states of Ohio, Kentucky, Tennessee, and Alabama, entered into a detailed agreement, parceling among themselves the business of a large number of cities in Western and Southern states, with the purpose and intent of largely increasing the price at which iron pipe should be furnished to such cities. When any such city sought competitive bids for iron pipe, the corporation entitled under this secret agreement to furnish such pipe would make its bid much above a fair market price, and the other companies would present still higher bids, to give the appearance of competition. The company intended would thus get the contract, but, under the same agreement, would have to pay a large bonus, to be divided among the other companies. Although these corporations were manufacturers of iron pipe, the par-

ticular agreement had reference to the sale and delivery of such pipe to municipal customers, its intended and direct effect being to exclude competition and raise the price of the commodity. The court said:

"Where the contract is for the sale of the article and for its delivery in another state the transaction is one of interstate commerce, although the vendor may also have agreed to manufacture it in order to fulfill his contract of sale. In such case a combination of this character would be properly called a combination in restraint of interstate commerce, and not one relating only to manufacture."

The proper construction of the Sherman anti-trust act, so far as it relates to railroad transportation, as deduced from these decisions of the Supreme Court appears to be this: (a) The act applies to railroads. And all contracts made between railroad companies for the purpose and having the effect of preventing competition by fixing rates, or empowering persons to fix them, and agreeing to conform to them when fixed, are in restraint of trade, and within the provisions of the statute, whether the rates so fixed are reasonable or unreasonable. (b) That contracts between divers manufacturers of a commodity, respecting their sales of that commodity, to be delivered by them outside the state, having the direct effect of stifling competition and raising the cost of the article to the purchaser, are also in restraint of trade, and within the statute. (c) That contracts which do not directly and necessarily affect transportation, or rates therefor, are not in restraint of trade, or within the statute, even though they may remotely and indirectly appear to have some probable effect in that direction.

The state anti-trust act must have the same construction in respect to traffic on railroads within the state.

Neither the Great Northern Company nor the Northern Pacific Company were parties to, or in their corporate capacity had anything to do with, the formation of the Northern Securities Company, nor of any of the contracts or proceedings complained of in the bill. The Northern Securities Company is merely an invester in and owner of a majority of the stock of each of these two railroad companies. It is not a railroad company, and has no franchise or power to manage or operate or direct the management or operation of either railroad in respect to rates or charges for transportation, or otherwise; and there is no scintilla of evidence that it has sought to control or interfere in respect to any of these matters. It has therefore done no act and made no contract in restraint of trade or commerce. Owning now a majority of the stock of each of these railroad companies, it has the power, by voting its stock, to elect the board of directors—the governing body—of each of these railroad companies. But the board of directors of each is a different body from the board of directors of the other, as no director of the Great Northern Company can be a director of the Northern Pacific Company. The directors of each railroad company will appoint its managing and other officers, and control its business and policy. Presumably, they will seek, in lawful ways only, to increase the business and prosperity of the railroad which they, as directors, represent.

The action of the defendant Hill in promoting the formation of the Northern Securities Company, under the circumstances and for the

purposes which the evidence discloses, and investing in its stock by the sale to it of his stock in the two railroad companies, involved no act or contract in restraint of trade or commerce, or affecting transportation or rates, more than any ordinary transfer of railroad stock from one person to another.

That my judgment, after most careful consideration of the facts and the law applicable thereto, as construed by the highest court, leads me to the conclusion that none of the defendants have violated the Minnesota anti-trust act—a conclusion apparently contrary to that reached by the eminent judges who, in this court, recently decided the case of United States v. Northern Securities Company, 120 Fed. 721, and who will doubtless in another court review this cause upon appeal—has necessarily caused hesitation and careful examination. But the rights of litigants and my own sense of duty alike require that my own deliberate judgment, guided by my understanding of authoritative expositions of the law, be given in all causes tried before me.

The decision of the case last cited, as I read it and understand it, does not specify or point out any contract, agreement, or act on the part of the defendants, or any of them, which is directly in restraint of trade or commerce, or which has any direct reference to trade, commerce, transportation, or rates, nor even any threat or avowed purpose on the part of any defendant to do any such act, or enter into any such contract or agreement. But it is argued that, because the Northern Securities Company has become the owner of a large majority of the stock of each of the two railroad corporations, it will be for its interest to suppress competition between them, by causing the two boards of directors of these railroad corporations, which it can fill by election, to enter into arrangements or agreements in restraint of trade, which will suppress competition; and as a corollary to this reasoning (or conjecture) the decision holds that the formation of the Northern Securities Company, and purchase by it of a majority of the stock of each of these railroad companies, are acts or contracts in restraint of trade, though of themselves, and without further action (not yet taken, and perhaps never to be taken) by the directors of the two railroad companies, the formation of the Northern Securities Company and its holdings of stock has and can have nothing to do, directly or indirectly, with trade, commerce, transportation, or rates.

To epitomize this decision: It is held that it will be for the interest of the Northern Securities Company to restrain trade by suppressing competition between these two railroad companies, and that by coercing or persuading the two boards of directors, whom it has the power to elect, it will certainly cause them to commit highly penal offenses, by entering into combinations, contracts, and arrangements in restraint of trade, in violation of the anti-trust act, and hence the Northern Securities Company is already guilty of these offenses that have never been committed or thought of by its officers or promoters, so far as appears, and it must be suppressed and destroyed. I am compelled to reject the doctrine that any person can be held to have committed, or to be purposing and about to commit, a highly penal offense, merely because it can be shown that his pecuniary interests will be thereby advanced, and that he has the power, either directly by him-

self, or indirectly through persuasion or coercion of his agents, to compass the commission of the offense.

Although the bill avers that the acts of the defendants complained of are in violation of the act of Congress of July 2, 1890, c. 647, 26 Stat. 209 [U. S. Comp. St. 1901, p. 3200]—the Sherman anti-trust act—the state of Minnesota has no authority to enforce that act by bill for injunction. Such a suit can only be instituted on behalf of the federal government by its attorney general, under the special provisions giving the United States Circuit Courts jurisdiction to prevent and restrain by injunction violations of that act. The state anti-trust act contains no provisions for restraining or enjoining violations of its provisions. As before stated, it is a highly penal statute; and without special statutory authority a court of equity has no jurisdiction to restrain the commission of criminal offenses which involve no threatened destruction of property or property rights.

3. The charge in the bill that the acts of the defendants contravene the statutes of Minnesota prohibiting the consolidation of parallel and competing lines of railroad presents a different question. Chapter 29, p. 154, Gen. Laws Minn. 1874, provides, as stated:

"No railroad corporation or the lessors, purchasers or managers of any railroad corporation, shall consolidate the stock, property or franchise of such corporation with, or lease or purchase the works or franchise of, or in any way control any other railroad corporation owning or having under its control a parallel or competing line."

This is the only statute on that subject of consolidating parallel and competing railroads that need be considered, as it covers whatever is contained in any other. This statute is a valid exercise of the police power of the state. Louisville, etc., Railroad v. Kentucky, 161 U. S. 677, 16 Sup. Ct. 714, 40 L. Ed. 849.

The prohibition against consolidating applies: (1) To railroad corporations. The Northern Securities Company is not a railroad corporation, and neither the Great Northern Company nor the Northern Pacific Company, in its corporate capacity, did any of the acts charged. (2) Lessees of railroad corporations. There were none. (3) Purchasers of railroad corporations. Construing this term as applying to those who acquire by deed or decree, having capacity to hold and enjoy the franchises and operate the railroad, there were none in this case. (4) Managers of railroad corporations. A railroad manager is the person having the administration, charge, and oversight of the operation and business of the railroad. Among the parties concerned, Mr. Hill alone was a railroad manager. He did not effect any consolidation. He promoted the formation of the Northern Securities Company, and sold to it stock of both railroad companies.

But the complainant contends that when the Northern Securities Company had, about December 1, 1901, purchased and become the owner of a large and controlling majority of the stock of the Northern Pacific Company, it became the purchaser of that railroad corporation, within the meaning of that word as used in the act of 1874, and became thereby disabled from acquiring, as it afterwards did, a controlling majority of the stock of the Great Northern Company. And upon the subject of purchasing a railroad by buying all the stock, I am cited

to chapter 94, Gen. Laws Minn. 1881, which provides that any railroad corporation may lease or purchase or become the owner or control or hold stock of any other railroad, when their respective railroads can be connected together and form a continuous line, with or without branches. But in that case the purchase of the stock would be by a railroad corporation having capacity to operate the railroad, even aside from the authority to do so either expressly or impliedly granted by this statute; and such purchaser could therefore rightfully assume the control, management, and operation of the railroad, the stock of which it had so acquired.

I am also cited to the case of Pearsall v. Great Northern Railway, 161 U. S. 646, 16 Sup. Ct. 705, 40 L. Ed. 838. Pearsall was the owner of 500 shares of the stock of the Great Northern Company, and filed the bill, in behalf of himself and other stockholders, to enjoin the Great Northern Company from entering into and carrying out an agreement with bondholders under mortgages of the Northern Pacific Company, who were about to foreclose the mortgages and reorganize the company, issuing new bonds to the amount of $100,000,000, to be guarantied by the Great Northern Company, also stock to a like amount, one-half of which was to be transferred to the stockholders of the Great Northern Company in consideration of such guaranty, and thereafter at all intersecting points traffic was to be exchanged between the two companies, and the common earnings therefrom divided on a mileage basis. The bill averred that the threatened contract, if carried out, would amount to a consolidation of the two railroads, in violation of the said Minnesota statute of 1874, and endanger the value of complainant's Great Northern stock. The court held that the transfer of one-half of the capital stock of the Northern Pacific Company to the shareholders of the Great Northern Company, as a body, for a consideration coming from the Great Northern Company as a corporation, was virtually a transfer of the stock to the Great Northern Company, who, having thus acquired one-half of the stock of the Northern Pacific Company, would easily and certainly obtain the little more necessary to assure it the mastership of the Northern Pacific Company, and result in the probable amalgamation of the two companies in violation of the statute; thus endangering the value of the complainant's shares. The relief sought by the complainant was therefore granted to protect his property interests against probable threatened danger. But there, again, the purport of the holding was that, if one railroad corporation acquired a controlling majority of the stock of another railroad corporation, it could operate it, or control its operation, under its own ample franchises and powers to operate railroads. The case is far from sustaining the idea that if a single investor in railroad stocks, whether a natural person or a corporation without railroad franchises, should acquire by purchase a majority or the whole of the stock of both the Northern Pacific Company and the Great Northern Company, that would work any consolidation of those two companies, or that such purchaser would have any power to manage or operate the railroads of both or either of said railroad companies. In the case under consideration the court is careful to note the difference in effect between the purchase of a controlling majority of the stock of a rail-

road corporation by a rival railroad corporation, which might control, manage and operate it, and a purchase of the same stock by an individual or individuals, though holding whatever amount of stock in the same rival railroad company. The court says:

"Doubtless these stockholders [of the Great Northern Company] could lawfully acquire by individual purchases a majority or even the whole of the stock of the reorganized [Northern Pacific] company, and thus possibly obtain its ultimate control; but the companies would still remain separate corporations, with no interests, as such, in common."

I am not able to agree with the suggestion that this expression may be regarded as one not necessary to the decision, and therefore perhaps not carefully considered. On the contrary, it seems to me to be a carefully considered and necessary limitation or explanation of general language elsewhere made use of in that decision.

It follows that as the Northern Securities Company is merely an invester in the stocks of these railroad corporations, not being itself a railroad corporation, and being without franchise, power, or authority to manage, control, or operate any railroad, its ownership of a majority of the stocks of these two railroad companies does not come within the prohibitive language of the statute of 1874. The two companies still remain separate corporations, with no interests, as such, in common. The case would not be different if one natural person with abundant capital should invest in the majority of the stocks of one of these companies, and another like person should invest in the majority of the stocks of the other company. The interest of the two, if they chose to act in harmony, would be the same as the interest of one person owning the whole.

But it is urged that the ownership by the Northern Securities Company of such a large majority of the stock of these two parallel railroads creates a monopoly, having a tendency to prevent competition between these railroads, and presents a case within the mischief intended to be remedied by the statute of 1874, and should be held, even if outside of the language of that statute, to be within the intention of the Legislature which enacted that statute; also that it is contrary to the public policy of the state, which seeks to promote competition between railroads as well as other common carriers. The terms "monopolies and trusts" are perhaps, in cases like this, too often employed at the bar to all business enterprises requiring and employing great aggregations of wealth, and in the vague sense in which, at the hustings, they are used to arouse envy and jealousy, forgetting the manifest necessity of such aggregations of wealth to produce the commodities, and their transportation, which our civilization and comfort require. Every railroad corporation is in one sense a monopoly. It has franchises giving rights and powers not common to all citizens. It alone can operate its own railroad, though subject to reasonable regulation by the state. All monopolies, in a strict sense, rest upon some grant by the sovereign power of an exclusive franchise or privilege. And with modern facilities for transportation and communication, all the statutes and learning respecting "forestalling," "regrating," and "engrossing" have become archaic, and even the meaning of those terms will hardly now be recognized.

123 F.—45

Where a statute like that of 1874, with particular detail, designates parties whom it prohibits from doing specified acts, not otherwise unlawful, to ask a court to extend that statute to parties not named, or to acts not so specified, on the ground that such extension may be conjectured to be within the intention of the Legislature, is an invitation to enter the domain of judicial legislation. The policy of the state appears in its legislation, and, where a policy is made clear by uniform legislation, it has much weight in the interpretation of any doubtful statute. It is clear from several statutes that the policy of the state of Minnesota is opposed to the consolidation of parallel railroads, and to the control by any railroad company of the operation and management of another company's parallel and competing railroad. It is deemed advantageous to the public that at least reasonable competition between such lines of railroad shall continue. While acts of railroad corporations, lessees, purchasers, and managers contrary to this policy are prohibited, there is no statute disclosing any policy as to what parties (other than competing railroad corporations) shall own the stock of any railroad corporation, or of any number of such corporations, or respecting the amount of such stock which any one party may own. The bill truthfully states, in substance (paragraph 7), that it has been the settled policy of Minnesota, since its organization as a territory, to develop its resources by the encouragement of railroad building therein, and refers to the many grants of land in aid of railroad construction. As showing the same policy, reference also might be made to very many donations for the like purpose by counties, cities, and towns, under legislative authority. The policy of the state in respect to the operation and management of railroads is disclosed by its statutes; especially by sections 379 to 403, vol. 1, General Statutes of Minnesota of 1894, under the heading of "Railroad and Warehouse Commission," which closely follows the provisions of congressional legislation respecting interstate commerce, and, under clearly specified regulations, places the supervision, oversight, and control of those matters—particularly the rates for transportation—in the hands of the designated state officials. It is plain from these statutes, as construed by the Supreme Court of the state, that it is the policy of the state that the railroads, with their rolling stock and appliances, shall be kept in a high state of safety and efficiency, and that rates of transportation, while kept ample to secure such result, shall always be fair, reasonable, stable, and uniform. Schedules of rates are to be kept publicly posted at every station, and no change or deviation from such published rates is permitted, nor any rebates allowed or advantage to one shipper over another, and no change in such rates is permitted until after 10 days' previous published notice has been given. Under this system shippers can count accurately the cost of transportation as an expense in their business, with the assurance that others engaged in like business must incur exactly the like expense; and untrammeled competition between rival railroads, resulting in rate wars, sporadic struggles for particular contracts or consignments, as well as all rebates, open or secret, all alike unfair or ruinous to carriers and shippers, are prohibited, under penalties, and intended to be entirely eliminated and

done away with, leaving as the only bases of competition between rival carriers the furnishing of the better accommodations, and the greater safety and celerity of carriage. All complaints that published rates are unreasonable are heard and determined by these state officials, who may fix rates binding on the railroads; thus necessarily making rates uniform as between rival railroads. As a result of this policy, and the absolute power of the state officials to fix rates, and keep them at the lowest reasonable figures, competition between rival railroads no longer reduces rates, as it did when railroad companies alone controlled them. On the contrary, where two or more railroads divide the transportation between two places, the necessity of considering greater fixed charges and greater cost of administration and operation may make the reasonable rate for transportation greater than if the whole business could be done, and was in fact done, by one railroad. However that may be, the Northern Securities Company is but an investing stockholder in these two railroad companies, without power to consolidate them or to interfere with the management or control of either. Because of its large holdings of these stocks, it may elect the board of directors of each, who must be composed of entirely different persons. Each board will appoint the officers and control the business and affairs of its own corporation, and will naturally seek to increase its business and property. Neither has any power to control the other nor to contract with the other in restraint of trade. There is no presumption that either will disobey the law, or be guilty of the commission of penal offenses. Should they do these things, then the anti-trust act of Minnesota will be for the first time violated, and the railroad corporations and their offending officials will be amenable to punishment, and to appropriate legal or equitable proceedings.

Decree will be entered dismissing the bill.