[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 135 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 136 
The plaintiff and defendant are respectively incorporated street railroad companies, located in the city of Buffalo, and the action was brought upon a contract to recover a sum stipulated to be paid, as liquidated damages, upon a breach thereof by either party, that should reduce its rates of fare below the prices authorized to be charged under the statutes in force on May 3, 1872, each party thereby agreeing to make no change therein, without the consent of the other. This contract was claimed to have been made by authority of chapter 474 of the Laws of 1872.
Subsequent to this contract the legislature, by chapter 600 of the Laws of 1875, enacted, in substance, that it should be unlawful for any street railroad company in Buffalo to charge more than five cents for each passenger carried on their respective roads, without regard to the distance traveled. This price was considerably less than the amount authorized to be charged by the former statute.
Immediately thereafter the defendant reduced its rates of fare to the price authorized by the act of 1875, and this reduction constitutes the breach of the contract, relied upon for a recovery.
No question is made but that if the act of 1875 was a valid enactment, the defendant was required to conform to it, and would have a good defense to the action. It is, however, claimed by the plaintiff that the act was unconstitutional and void, inasmuch as it impaired the obligation of contracts. The only contract claimed to have been impaired is the one sued upon.
Among the defenses made to the action, is the claim that the agreement had terminated before the alleged breach by virtue of its own limitation, and it is also urged that a reasonable construction of the language of the agreement shows that *Page 138 
its obligations were not intended to survive, any statutory reduction of the rates of fare chargeable upon such railroads.
There is no express provision in the contract providing for the period of its duration, but there are several, which furnish strong grounds for the inference that the parties did not intend that it should continue, after an unfavorable change in the rates of fare. Among these provisions it is only necessary to refer to one, providing that, "the said party of the first part so long as it receives for the transportation of passengers the fare allowed by law on the 3d day of May, 1872, and no longer," will make connections with roads to be built by the party of the second part, and run a sufficient number of cars to accommodate all passengers applying for transportation, etc.; and another contained in the fifth paragragh which provides that the party of the first part agrees that it will, during the continuance of the contract, charge the same rates for the transportation of passengers over its railroads, or any part thereof, that it is "permitted to charge by the statutes in force regulating the same on the 3d day of May, 1872, and that it will not make any change in such rates without the consent of the party of the second part."
Similar provisions were contained in the contract relating to the obligations of the party of the second part, and contemplating the termination of the contract upon the same contingency.
It is quite clear that the parties had in view a condition of affairs under which they would not be permitted to charge and receive the rates of fare authorized by former acts, and in that event expressly provided for the termination of the contract.
But the plaintiff contends that the rates authorized on May 3, 1872, still continue, so far as these two companies are concerned, by force of the obligations of their contract, and the constitutional inhibition upon the state from passing any law impairing its effect.
We are not impressed with the soundness of this contention. It was competent for the parties to agree upon any *Page 139 
period as the duration of their contract, and they might, if they chose to do so, provide that it should cease upon the passage of even an unconstitutional law.
It is difficult to explain what is meant by the expression that the contract should continue so long as the companies received and were permitted to charge the rates authorized on May 3, 1872, and no longer, if there was no constitutional power to effect such change. Settled rules of construction require us to give some meaning and effect to all of the language employed in the contract, provided it can be done without doing violence to the plain object and intent of the parties in making their agreement.
It is quite clear that the parties assumed the existence of the power of the legislature to change the rates, and contracted with reference to such a contingency. A fair and reasonable construction of the contract would seem to be that the parties intended any change to be effected by the voluntary action of the parties, and not one made in obedience to paramount authority. It would be unreasonable to say that either party intended to run the hazard and danger of disobedience to a statute of the state, and there is nothing, we think, in the contract which required it to do so.
Every exercise of legislative power is presumed to be constitutional, and it cannot, without the clearest language indicating such an intention, be supposed that parties anticipated the enactment of an unconstitutional law, or contracted upon such an assumption.
We are, therefore, of the opinion that the contract, so far as this provision was concerned, had terminated by force of its own limitation when the act of 1875 was enacted. Construed in this way, the legislation of 1873, incidentally referring to this contract and providing that its validity should not be affected thereby, is intelligible, and perhaps sustainable, but upon any other theory it is difficult to see its object or design. We cannot ascribe to the legislature an intention by that act, to hamper and restrain its successors in the exercise of legitimate constitutional power over the subject of railroad fares *Page 140 
(Railroad Commission Case, 116 U.S. 307), and if it was an effort to pass upon the validity of the contract, that subject was a judicial one and beyond the province of legislative authority to act upon.
But we are further of the opinion that the act of 1875 was a valid exercise of legislative power, and did not impair the obligations of any contract, within the meaning of the constitutional provision.
The inability of one legislature to limit or control the legislative action of its successors is a familiar principle which needs no citation to support it. (Pres. Church v. Cityof New York, 5 Cow. 538.)
The same authority which confers upon one body the power of legislation authorizes its successors, in the exercise of their duty, to change, alter and annul existing laws when, in their judgment, the public interest requires it. In the performance of their duty of legislating for the public welfare, each successive body must, from necessity, be left untrammeled except by the restraints of the fundamental law, and when called upon to act upon subjects which concern the health, morals or interests of the people, as affected by a public use of property for which compensation is exacted by its owners, they are unlimited by constitutional restraint. It is unnecessary to discuss this proposition with much fullness as it was conceded by the appellant upon the argument, and is repeated in its printed brief, that the authority of the legislature in the exercise of its police powers could not be limited or restricted by the provisions of contracts between individuals or corporations.Pacta privata publico juri derogare non possunt.
This proposition is also abundantly established by authority. (Pres. Church v. City of New York, supra; Coats v. Mayor,etc., 7 Cow. 585; Vanderbilt v. Adams, Id. 349; Mayor,etc. v. Second Ave. R.R. Co., 32 N.Y. 261; People v. B. A.R.R. Co., 70 id. 569; Stone v. Farmers' L. T. Co.,116 U.S. 307; Barbier v. Connolly, 113 id. 27.)
It was said in People v. Boston and Albany Railroad Company
(supra), that "railroad corporations hold their *Page 141 
property and exercise their functions for the public benefit, and they are therefore subject to legislative control. The legislature which has created them may regulate the mode in which they shall transact their business, the price which they shall charge for the transportation of freight and passengers, etc. * * * It may make all such regulations as are appropriate to protect the lives of persons carried upon railroads or passing upon highways crossed by railroads. All this is within the domain of legislative power, although the power to alter and amend the charters of such corporations has not been reserved. * * * Such legislation violates no contract, takes away no property, and interferes with no vested right."
In Munn v. Illinois (94 U.S. 124), Chief Justice WAITE, in speaking of the implied powers which social organization confers upon its government over the conduct and property of members, says that "it does authorize the establishment of laws requiring each citizen to so conduct himself and so use his own property as not necessarily to injure another. This is the very essence of government, and has found expression in the maxim sic utero tuout alienum non loedas. From this source came the police powers, which, as was said by Mr. Chief Justice TANEY in the LicenseCase (5 How. 583), `are nothing more or less than the powers of government inherent in every sovereignty, * * * that is to say * * * the power to govern men and things.' Under these powers the government regulates the conduct of its citizens one towards another, and the manner in which each shall use his own property, when such regulation becomes necessary for the public good. In their exercise it has been customary in England from time immemorial, and in this country from its first colonization, to regulate ferries, common carriers, hackmen, bakers, millers, wharfingers, innkeepers, etc., and in so doing to fix a maximum of charge to be made for services rendered, accommodations furnished, and articles sold."
Judge BRADLEY, in the Sinking Fund Cases (99 U.S. 747), referring to the Munn case, says: "The inquiry there was as *Page 142 
to the extent of the police power in cases where the public interest is affected; and we held that when an employment or business becomes a matter of such public interest and importance as to create a common charge or burden upon the citizen; in other words, when it becomes a practical monopoly, to which the citizen is compelled to resort, and by means of which a tribute can be exacted from the community, it is subject to regulation by the legislative power."
We think it unnecessary to discuss the question as to how far the legislature were authorized to go in regulating the affairs of corporations under the power of amendment and repeal imposed by the Revised and other statutes. (R.S. [7th ed.] § 8, tit. 3, chap. 18, part 1, p. 1531.)
It seems to be conceded by all of the authorities that such reservations confer upon them power to regulate, to a certain extent, the general management and control of the internal affairs of such corporations, but the grounds already referred to are sufficient to dispose of the case without considering questions not essential to that end.
We think the authorities cited are decisive of the question, and lead to an affirmance of the judgment.
The judgment of the court below should, therefore, be affirmed.
All concur, EARL and GRAY, JJ., in the result.
Judgment affirmed. *Page 143