## TOPHAM v. INTERURBAN ST. RY. CO.

(Supreme Court, Appellate Term.   January 19. 1904.)

1. CARRIER—REFUSAL TO GIVE TRANSFER—EXCUSE.

It is no excuse for the refusal of a street railroad company to give a passenger a transfer, as required by statute, that he could travel over another route of its system for one fare.

2. SAME.

It is no excuse for the refusal of a street railway company to give transfers at a certain point, as required by statute, that to give transfers there would cause undue crowding on the street and at the crossing.

3. SAME—STATUTORY REGULATION OF FARES.

Const. art. 8, § 1, provides that corporations may be formed under general laws. Laws 1850, p. 211, c. 140, authorized the formation of railroad corporations, which should be subject to 1 Rev. St. (1st Ed.) p. 600, pt. 1, c. 18, tit. 3, § 8, providing that the charter of every corporation shall be subject to alteration in the discretion of the Legislature. *Held*, that a railroad corporation formed under Laws 1850, p. 211, c. 140, is subject to statutory regulation of the fares it may charge.

4. SAME—LEASE OF RAILROAD.

In view of the course of legislation (Laws 1839, p. 195, c. 218; Laws 1850, p. 211, c. 140; 1 Rev. St. [1st Ed.] p. 599, pt. 1, c. 18, tit. 3; Laws 1884, pp. 314, 315, c. 252, §§ 15, 18; Laws 1885, pp. 525, 526, c. 305, §§ 1, 4; Laws 1890, p. 1114, c. 565, art. 4, §§ 103, 104) relating to the leasing of railroads, Laws 1892, p. 1406, c. 676, art. 4, § 104, providing that every railroad corporation entering into "such contract" shall give a transfer to each passenger, entitling him to one continuous trip to any portion of any railroad embraced in "such contract," refers to contracts of lease of railroads as well as to traffic contracts for the use of roads.

5. SAME—CORPORATION OPERATING RAILROADS.

In view of Laws 1892, p. 1399, c. 676, art. 4, § 90, as amended by Laws 1895, p. 791, c. 933, providing that the provisions of the article apply to every corporation which operates a street surface railroad, section 104, art. 4, c. 676, p. 1406, Laws 1892, providing that "every such corporation" shall give a transfer to each passenger, applies to a corporation formed under the stock corporation law, which owns and operates a railroad.

6. SAME—RAILROADS WITHIN CITY.

In Laws 1892, p. 1406, c. 676, art. 4, § 104, requiring corporations operating street railroads to carry passengers for a single fare, and providing that its provisions shall only apply to railroads wholly within the limits of any city, the proviso refers to the railroads, and not to the corporations operating them.

7. SAME—CONSOLIDATION OF RAILROADS.

Where various street railway companies consolidated as authorized by the railroad law (Laws 1890, p. 1082, c. 565, as amended by Laws 1892, p. 1382, c. 676), the consolidated company and its successors in interest, under section 90, art. 4, c. 676, p. 1399, Laws 1892, as amended by Laws 1893, p. 908, c. 434, providing that the provisions of the article shall apply to every corporation operating a street railroad in a city, are subject to section 104, art. 4, c. 676, p. 1406, Laws 1892, requiring every railroad corporation entering into "such contract" to give transfers to passengers.

Appeal from Municipal Court, Borough of Manhattan, Second District.

Action by Henry Topham against the Interurban Street Railway Company. From a judgment in favor of defendant, plaintiff appeals. Reversed.

Argued before FREEDMAN, P. J., and GILDERSLEEVE and GREENBAUM, JJ.

Edward B. Whitney (Frank L. Mahan, of counsel), for appellant.

Paul D. Cravath (Joseph P. Cotton, Jr., of counsel), for respondent.

FREEDMAN, P. J. The plaintiff appeals from a judgment of the Municipal Court in favor of the defendant in an action to recover penalties, based upon repeated refusals by defendant to furnish plaintiff with transfers from one railroad line to another at the intersection of Broadway and Twenty-Third street in the city of New York. The action was based upon the provisions of section 104 of the railroad law (Laws 1890, p. 1114, c. 565, as amended by Laws 1892, p. 1406, c. 676). The plaintiff on each occasion was a bona fide passenger, but, even if he had ridden for the very purpose of obtaining a penalty, he was, under the decision of Fisher v. N. Y. C. & H. R. R. Co., 46 N. Y. 644, entitled to recover, if the defendant was legally bound to transfer him. The fact that there was another route embraced within the defendant's system, over which the plaintiff on each occasion might have traveled for a single fare, can make no difference; and the fact that the giving of transfers at the point in question might cause undue crowding in the street and at the crossings is no excuse for not giving them, unless sanctioned by legislative action.

The only question, therefore, requiring serious consideration is whether the defendant is bound, under section 104 of the railroad law, to furnish transfers from the Twenty-Third street line to the Broadway line, and vice versa, at the point where these lines cross each other at Broadway and Twenty-Third street. For the purpose of determining this question, it is important to have a clear view of the precise relation of the defendant to the lines in question, and of the status of each line with respect to the application of section 104 of the railroad law.

The Broadway line is owned by the Broadway & Seventh Avenue Railroad Company, which was incorporated in 1864, acquired its franchise under special acts of the Legislature, viz., chapter 513, p. 1042, Laws 1860, and chapter 500, p. 1106, Laws 1866, and began the operation of its line in 1872. In 1890 its line was leased to the Houston, West Street & Pavonia Ferry Railroad Company, which was subsequently consolidated with certain other companies into the Metropolitan Street Railway Company. The Twenty-Third street line is owned by the Twenty-Third Street Railway Company, which was incorporated in 1872, acquired its franchise to operate its line under chapter 823, p. 1946, of the Laws of 1869, and chapter 100, p. 177, of the Laws of 1873, and began the operation of its line in 1872. In 1893 its line was leased to the Houston, West Street & Pavonia Ferry Railroad Company, which had previously become the lessee of the

Broadway line, as already stated. By consolidation agreement dated November 29, 1893, between the Houston, West Street & Pavonia Ferry Railroad Company, the Broadway Railway Company, and the South Ferry Railroad Company, the first Metropolitan Street Railway Company was formed. By consolidation agreement of May 18, 1894, between the first Metropolitan Street Railway Company, the Metropolitan Cross-Town Railway Company, and the Lexington Avenue & Pavonia Ferry Railroad Company, the second Metropolitan Street Railway Company was formed. By consolidation agreement of November 7, 1895, between the Metropolitan Street Railway Company, last mentioned, and the Columbus & Ninth Avenue Railroad Company, the present Metropolitan Street Railway Company was formed. Each of said consolidation agreements was, in express terms, made "as provided by the railroad law"; and in each case the capital stock, franchises, and property of the contracting corporations were merged and consolidated and accepted and received by the new company subject to all the charges thereon, and the duties and liabilities incurred by each of the contracting corporations. In April, 1902, the Metropolitan Street Railway Company of 1895 (the product of the several consolidations referred to) leased its lines then operated by it within the limits of the boroughs of Manhattan and the Bronx to the Interurban Street Railway Company. The defendant, the Interurban Street Railway Company, was organized in 1891, under the stock corporation law (chapter 564, p. 1066, of the Laws of 1890), to take and possess the property and franchises of a street railroad running from Mt. Vernon to Tuckahoe, in Westchester county. This is the only line of railroad owned by it, and it lies entirely outside of the city of New York, and does not physically connect with either the Broadway line or the Twenty-Third street line.

Section 104 of the railroad law (chapter 565, p. 1114, of the Laws of 1890, as amended by chapter 676, p. 1406, of the Laws of 1892) reads as follows:

"Sec. 104. Contracting Corporations to Carry for One Fare—Penalty. Every such corporation entering into such contract shall carry or permit any other party thereto to carry between any two points on the railroads or portions thereof embraced in such contract any passenger desiring to make one continuous trip between such points for one single fare, not higher than the fare lawfully chargeable by either of such corporations for an adult passenger. Every such corporation shall upon demand, and without extra charge, give to each passenger paying one single fare a transfer, entitling such passenger to one continuous trip to any point or portion of any railroad embraced in such contract, to the end that the public convenience may be promoted by the operation of the railroads embraced in such contract substantially as a single railroad with a single rate of fare. For every refusal to comply with the requirements of this section the corporation so refusing shall forfeit fifty dollars to the aggrieved party. The provisions of this section shall only apply to railroads wholly within the limits of any one incorporated city or village."

Under the concluding sentence of said section, it is clear that, inasmuch as the line of the defendant is entirely outside the city limits, the defendant would not be bound to furnish transfers to it from the lines acquired under lease from the Metropolitan Company, or vice versa, even if all of said lines were physically connected. But that fact does not take from the operation of the statute, if otherwise ap-

plicable, the system of leased railroads which are wholly within the city limits. The lease from the Metropolitan Company to the defendant was not a contract for the use of their respective routes, and there were no railroads of the respective parties on which there were two points between which passengers could be carried, or which could be operated as a single railroad, and consequently there was no traffic contract between the parties. It was, for the purposes of this case, a lease, pure and simple.

The defendant insists that the leases of the Broadway line and the Twenty-Third street line created no obligation to permit free transfers in respect of those lines, because in each case the lessor company acquired its franchise from the state, and began the operation of its line prior to the enactment of the statute in relation to transfers, which finally became section 104 of the railroad law, and that consequently the Legislature could not by subsequent legislation impose the duty upon the Metropolitan Street Railway Company to give transfers at the point now under consideration. And it is further contended that in no aspect of the case can the provisions of section 104 as to transfers be enforced against the defendant.

The main reliance of the defendant is upon the opinion of Parker, C. J., of the Court of Appeals, in Ingersoll v. Nassau Electric R. Co., 157 N. Y. 453, 52 N. E. 545, 43 L. R. A. 236. The foundation of the Ingersoll Case was, as in the present case, a contract for the operation of a railroad, entered into subsequent to the enactment of section 78 of the railroad law (Laws 1890, p. 1106, c. 565). It was sought to subject the railroad companies who were parties to the contract to the operation of sections 91 and 102 of the railroad law (pages 1108, 1113), which, if applicable, would seem to require the lessee company to obtain the consent of the abutting property owners before it could operate the leased line—a requirement which did not exist under the law as it stood prior to the enactment of the general railroad law in 1884. Parker, C. J., held that article 4 of the railroad law, which embraces sections 91 and 102, which were in question in the Ingersoll Case, and section 104, which is in question in the present case, was not intended by the Legislature to apply to corporations which had acquired their franchises and constructed their railroads prior to the enactment of the law, because otherwise the legislation would be unconstitutional, and that such corporations had a vested right to enter into contracts of lease, which could not be taken away or diminished by subsequent legislation. It was also held that the act of 1839 entitled "An act authorizing railroad companies to contract with each other" (chapter 218, p. 195, of the Laws of 1839) has been continued in force from the time of its enactment to its incorporation into section 78 of the railroad law; that it applies to both steam and surface railroad corporations, and authorizes both traffic agreements and leases; and that, as against rights which had become vested, it remains unaffected by subsequent constitutional provisions. The real question presented in the Ingersoll Case was whether one railroad company, which had leased a portion of the lines of another, could operate its cars over such portion without a specific consent to such operation by the abutting owners, who had already given their con-

sent to the building and operation of the leased portions. In concluding that no such second specific consent was necessary, Chief Justice Parker followed two lines of argument. The first of these was based upon chapter 218, p. 195, of the Laws of 1839. The second, which is found on pages 469 to 471 of the opinion, 157 N. Y., pages 550, 551, 52 N. E., 43 L. R. A. 236, proceeded upon the theory that a road which ran its cars over portions of the lines of another by virtue of a lease was not "operating" a railroad, as that term is employed in the Constitution and in sections 91 and 102 of the railroad law. Such being the case, it is impossible to know whether any of the other three judges of the Court of Appeals who concurred in the result agreed with the chief justice in the views which he expressed in regard to chapter 218, p. 195, of the Laws of 1839. Mr. Justice Vann, on the other hand, dissented most emphatically on that point. Moreover, in the Ingersoll Case the court was considering, not a question of fares that might be charged, but a question which related to the right of a railroad to operate its road at all, and which, if decided in the negative, would have prevented a corporation from the substantial enjoyment of its franchises. The distinction between the two classes of questions has been frequently pointed out. People ex rel. Kimball v. Boston & Albany R. Co., 70 N. Y. 569, cited in People v. O'Brien, 111 N. Y. 48, 58, 18 N. E. 692, 2 L. R. A. 255, 7 Am. St. Rep. 684; Buffalo E. S. R. Co. v. Buffalo St. R. Co., 111 N. Y. 140, 19 N. E. 63, 2 L. R. A. 284; People v. Budd, 117 N. Y. 11, 20, 22 N. E. 670, 682, 5 L. R. A. 559, 15 Am. St. Rep. 460; Pearsall v. Great Northern Railway, 161 U. S. 646, 16 Sup. Ct. 646, 40 L. Ed. 838.

In People ex rel. Kimball v. B. & A. R. Co., supra, it was said, and in Buffalo E. S. R. Co. v. Buffalo St. R. Co., 111 N. Y. 140, 19 N. E. 65, 2 L. R. A. 284, reiterated, that:

"Railroad corporations hold their property and exercise their functions for the public benefit, and they are therefore subject to legislative control. The Legislature which has created them may regulate the mode in which they shall transact their business, the price which they shall charge for the transportation of freight and passengers, etc. * * * It may make all such regulations as are appropriate to protect the lives of persons carried upon railroads, or passing upon highways crossed by railroads. All this is within the domain of the legislative power, although the power to alter and amend the charters of such corporations has not been reserved. * * * Such legislation violates no contract, takes away no property, and interferes with no vested right."

In The Mayor, etc., v. Twenty-Third Street Railway Co., 113 N. Y. 311, 21 N. E. 60, it was held that the act of 1873 (chapter 647, p. 1016, Laws 1873) requiring the Bleecker Street & Fulton Ferry Railroad Company, a street railroad corporation organized under the general railroad act (chapter 140, p. 211, Laws 1850), to pay into the treasury of the city of New York 1 per cent. of the gross receipts, instead of a license fee, as before prescribed (chapter 199, p. 317, Laws 1873), was constitutional; that it must be deemed an alteration and amendment of the charter of the company, and so within the power of the Legislature, by the general act, the provisions of the Revised Statutes to which corporations organized under said act

are by its terms made subject, and the state Constitution (article 8,
§ 1). And it was further held that when said company leased its-
property rights, privileges, and franchises to the defendant, the latter
was bound to pay the percentage, although the lease imposed upon it
no such obligation.

Article 8, § 1, of the Constitution of the state of New York, ex-
pressly provides, and since 1846 has provided, as follows:

"Corporations may be formed under general laws; but shall not be created
by special act, except for municipal purposes, and in cases where, in the judg-
ment of the Legislature, the objects of the corporation cannot be attained un-
der general laws. All general laws and special acts passed pursuant to this-
section may be altered from time to time or repealed."

And section 1, c. 140, p. 211, of the Laws of 1850, entitled "An act
to authorize the formation of railroad corporations," provides that
every corporation formed under it shall be subject to the provisions
contained in title 3 of chapter 18 of the first part of the Revised Stat-
utes, the eighth section of which reads as follows:

"Sec. 8. The charter of every corporation, that shall hereafter be granted
by the Legislature, shall be subject to alteration, suspension and repeal, in the
discretion of the Legislature." 1 Rev. St. (1st Ed.) p. 600.

This power has remained in the Legislature ever since.

In view of the existence of these constitutional and statutory pro-
visions at the time of the formation of the corporations which subse-
quently were consolidated with the Metropolitan Street Railway Com-
pany, and at the time of the formation of the present Metropolitan
Street Railway Company under the provisions of the railway law,
none of the said corporations possessed any vested rights in respect
to the maintenance of a certain rate of fare which was beyond legis-
lative control. The cases above referred to clearly show, when read
in full, that even vested rights may to some extent be interfered with
by the Legislature in the exercise of the police power or the right of
eminent domain of the state. This was conceded by Parker, C. J.,
in Ingersoll v. Nassau Electric R. Co., 157 N. Y. 463, 52 N. E. 545,
43 L. R. A. 236. In this connection it may also be pointed out that
although the opinion of Parker, C. J., did not proceed upon that
ground, the right to operate the road by the Atlantic Avenue Railroad
Company, as discussed by that learned jurist, in fact dated back to
the provisions of chapter 256, p. 453, of the Laws of 1832, and chapter
178, p. 231, of the Laws of 1834.

It now having been sufficiently shown that the right of the present
Metropolitan Street Railway Company at the time of its consolidation
with its constituent companies to operate the lines then acquired was
not beyond legislative regulation as to the mode or manner of such
operation, and that a statute regulating the rate of fare is a legislative
exercise of the police power inherent in the state, it remains to be
seen whether section 104 of the railroad law, as amended, applies to
the case at bar. Upon this point it is contended that the said section
is inapplicable because it applies only to traffic contracts under which
each company retains its line, and not to leases, and that therefore in
every aspect of the case it is inapplicable to the defendant.

The Appellate Division of the First Department, in Mendoza v. Metropolitan Street Railway Company, 48 App. Div. 65, 62 N. Y. Supp. 580, and s. c., on reargument, 51 App. Div. 433, 64 N. Y. Supp. 745, had occasion to consider the question of the applicability of section 104 to leases, to some extent, and found that the "contract" therein referred to is the contract authorized by section 78 of the same law, which, as shown both by the context of that section and its judicial construction, includes a lease. The case went off on a point of pleading, but it turned on the question whether either party to a street railroad lease is required to extend the universal transfer system to lines which it subsequently acquires, and which are not embraced within any lease or other contract. O'Brien, J., upon the original argument (48 App. Div., at page 65, 62 N. Y. Supp. 582), said:

"The right of a passenger to a continuous trip for a single fare extends not alone to the routes or lines of the leased routes, but also to such routes as at the execution of the lease were owned, controlled, or operated by the corporation to whom the lease was made."

Rumsey, J., on motion for reargument (51 App. Div., at page 433, 64 N. Y. Supp. 747), said:

"Strictly speaking, when one railroad leases the road of another, the only road embraced in the contract is the one leased; but, as the power to lease is derived from the authority given to one railroad corporation operating or owning a railroad to contract with another such corporation for the use of their respective roads, it is necessarily to be inferred that the roads embraced within that contract are the roads operated or leased by the two roads between whom the contract is made."

Similarly, Hirschberg, J., delivering the opinion of the Appellate Division for the Second Department, referred arguendo to this section as relating "to transfers where passengers are carried over connecting roads operated together under either leases or traffic contracts." Barnett v. Brooklyn Heights R. Co., 53 App. Div. 438, 65 N. Y. Supp. 1068.

The principle of these decisions has been followed in a series of Municipal Court decisions, which were not only carefully considered, but in some instances also confirmed by abandonment of appeals taken therefrom.

In view of the defendant's earnest contention in the present case, however, that after all it was only assumed in the Mendoza Case that section 104 applies to leases as well as traffic contracts, the inquiry will be further pursued.

In chapter 140, p. 211, of the Laws of 1850, there can be found no provision which extends to corporations formed under that law the power of leasing previously conferred upon railroad corporations by chapter 218, p. 195, of the Laws of 1839. On the other hand, the powers which corporations formed under chapter 140, p. 211, of the Laws of 1850, have, and the powers which such corporations have not, are very clearly set forth in the act. See sections 1, 28, c. 140, pp. 211, 223, Laws 1850. Corporations formed under that law have no other powers than those specified in the act of 1850 and those specified in 1 Rev. St. (1st Ed.) p. 599, pt. 1, c. 18, tit. 3. Among those powers the power of leasing the company's road cannot be found.

In view of the foregoing facts, it would appear that the principle that "a grant of power to a corporation is to be strictly construed against it, and nothing will be presumed to pass by the grant unless it be expressed in clear and unambiguous language," would apply, and would result in depriving any railroad company formed under chapter 140, p. 211, of the Laws of 1850, of the power to make a lease of its railroad, unless such power had been conferred upon it by some act of the Legislature passed after the passage of chapter 140, p. 211, of the Laws of 1850. Pearsall v. Gt. Northern Ry. Co., 161 U. S. 646, 16 Sup. Ct. 646, 40 L. Ed. 838.

Prior to the street railroad law of May 6, 1884, it was not settled whether street railroads had the right to lease each other. The power was derived from the act of 1839, p. 195, c. 218, entitled "An act authorizing railroad companies to contract with each other," viz.:

"It shall be lawful hereafter for any railroad corporation to contract with any other railroad corporation for the use of their respective roads, and thereafter to use the same in such manner as may be prescribed in such contract. But nothing in this act contained shall authorize the road of any railroad corporation to be used by any other railroad corporation, in a manner inconsistent with the provisions of the charter of the corporation whose railroad is to be used under such contract."

While the language of this statute was not entirely apt for that purpose, it was extended by judicial construction so as to include the power to lease.

Section 15 of the street railroad act of May 6, 1884 (page 314, c. 252), authorized any street surface railroad company to lease to any other such company authorized to run upon its route, but ended with the following proviso:

"But nothing in this section shall be construed to authorize any railroad company in cities of over 300,000 population to lease its rights or franchises to any other company in said cities which owns and operates a road parallel thereto."

The saving clause (section 18, p. 315) preserved "any rights heretofore acquired under the laws of this state by any horse railroad company," and "any right of any existing street railroad company to construct, extend, operate and maintain its road in accordance with the terms and provisions of its charter."

The prohibition against the leasing of parallel lines was removed, so far as the old city of New York was concerned, by the act of 1885, pp. 525, 526, c. 305, entitled "An act authorizing street surface railroad companies to contract with each other, and providing for a proper system of transfer of passengers," which reads as follows:

"Section 1. It shall be lawful hereafter for any street surface railroad company, or any corporation owning or operating a street surface railroad or railroad route, to contract with any other such company or corporation for the use of their respective roads or routes or any portion thereof, subject to the provisions, restrictions and conditions hereinafter stated, and thereafter to use or to permit the use of the same in such manner as may be prescribed in such contract. But nothing in this act shall authorize the road or route of any railroad corporation to be used or operated by any other railroad corporation in a manner inconsistent with the provisions of the charter of the corporation whose railroad or railroad route is to be used or operated under such contract."

"Sec. 4. Each and every company entering into any contract under the power conferred by this act shall carry or permit any other party to such contract to carry between any two points on the railroads or portions thereof embraced within such contract, any passenger desiring to make one continuous trip between such points for one single fare not higher than the fare lawfully chargeable by either of such companies for an adult passenger, and each and every such company shall, upon demand and without extra charge, give to each passenger paying one single fare a transfer entitling such passenger to one continuous trip to any point or any portion of any railroad embraced within such contract, to the end that the public convenience may be promoted by the operation of the railroads embraced within such contract to the extent of their inclusion therein substantially as a single railroad with a single rate of fare. For every refusal to comply with the requirements of this section the company so refusing, and having contracted as aforesaid, shall forfeit the aggrieved party the sum of fifty dollars, which may be recovered in any court of competent jurisdiction. This act shall not apply to cities having less than eight hundred thousand population.

"Sec. 5. All acts and parts of acts inconsistent with the provisions of this act are hereby repealed."

The act of 1885 thus absolutely repealed all prior legislation on the subject of street railroad leases in the old city of New York, containing no saving clause. Its provisions have ever since remained upon the statute books. The general railroad law of 1890 contained a special article (article 4) covering the subject of street railroads, while some general provisions applicable to them, among others, were left in, or have since been added to, the earlier articles. The law of 1839 was substantially repeated in section 78 of new revision, while the provision of the street railroad law of 1890 against leasing of parallel lines was continued and made general by section 80. The first section of the act of 1885 was continued as section 103, and the third section as section 104, while the fourth section, establishing the public right of free transfer, was substantially continued as section 105. The limitation of these provisions of 1885 to cities with a population of 800,000 or more was continued by section 103, and Brooklyn, upon the federal census of 1890, was brought under them. In 1892 the railroad law was revised, and in the revisions the paragraph shifting occurred which has caused the apparent obscurity in the present law. The limitation to cities of 800,000 population or over was stricken out. Sections 103 and 104, having thus been rendered unnecessary, were stricken out where they stood, and consolidated with section 78. A new section (103) was introduced, dealing with an entirely different subject, and the old section 105 was pushed up, and renumbered as section 104. It also became necessary to insert a new provision in order to prevent the right of free transfer for a single fare from fastening itself upon long lines of country railroads. This led to the insertion in the revision of 1892 of the final proviso that the free transfer right "shall apply only to railroads wholly within the limits of any one incorporated city or village."

Enough has now been said to demonstrate that section 104, as it now stands, does not apply exclusively to traffic contracts, but also to leases. The question now remains as to the kind of corporations to which the words "every such corporation entering into such contract" apply, especially as the Interurban Street Railway Company is not a railroad corporation, but a corporation owning and operating a

street surface railroad, or railroad route, and has been organized under the stock corporation law. A cursory examination of the provisions of chapter 218, p. 195, of the Laws of 1839, and of the subsequent laws in regard to the lease of railroads and railroad routes that have been enacted by the Legislature from that time until 1893, will emphasize the distinction that exists between railroad corporations and corporations which, while not railroad corporations, have the right to operate railroads. Railroad companies have been known in this state from the earliest times, but corporations which are not themselves formed under any railroad act, but have the power to operate railroads, are a much more modern form of corporation, and an essentially different form.

Chapter 218, p. 195, of the Laws of 1839, reads as follows:

"Section 1. It shall be lawful hereafter for any railroad corporation to contract with any other railroad corporation for the use of their respective roads," etc.

Chapter 252, p. 314, of the Laws of 1884, contains the following provision:

"Sec. 15. It shall be lawful for any street surface railroad company or companies to lease or transfer its or their rights, subject to all its or their obligations in respect thereof, to run upon or to use any portion of its or their railroad tracks to any other street surface railroad company authorized to run upon such route," etc.

It will be noticed that neither of said statutes authorized any railroad company to lease its line to any other corporation, except a railroad corporation. In 1885, however, by chapter 305, p. 525, of the Laws of that year, an entirely new power was given to street railroad companies. The following is a quotation from section 1 of that act, viz.:

"Section 1. It shall be lawful hereafter for any street surface railroad company, or any corporation owning or operating a street surface railroad or railroad route, to contract with any other such company or corporation for the use of their respective roads or routes or any portion thereof," etc.

At the same time, by section 4 of the same act there was imposed upon street surface railroad corporations who availed themselves of the provisions of section 1 the obligation to issue transfers and charge single fares. When the railroad law was enacted by chapter 565 of the Laws of 1890 the distinction which has already been pointed out was preserved. We find, therefore, repeated in section 78, c. 565, p. 1106, of the Laws of 1890, the provisions of chapter 218, p. 195, of the Laws of 1839:

"Sec. 78. Lease of Road. Any railroad corporation may contract with any other railroad corporation for the use of their respective roads," etc.

We also find repeated in section 103, c. 565, p. 1114, of the Laws of 1890, the provisions of chapter 305, p. 525, of the Laws of 1885:

"Sec. 103. Corporations may Lease or Contract with Each Other for the Use of Road. Any street surface railroad corporation or any corporation owning or operating any such railroad or railroad route, in any city having a population of eight hundred thousand or more, may contract with any other such corporation for the use of their respective roads or routes in such city," etc.

And in section 105 of the Laws of 1890 we also find repeated the condition that every such corporation entering into such contract shall issue transfers, etc.

The foregoing observations make it obvious that the Legislature recognized clearly the distinction between a railroad corporation, pure and simple, and a corporation which, while formed under some other law than a railroad law, had the right to operate a railroad or railroad route. Having first given the railroad corporations the right to lease their lines to other railroad corporations, and recognizing that this power, under familiar principles of law, would be construed strictly against such companies, the Legislature in 1885 saw the advisability of going a step further in the same direction. The Legislature, therefore, in 1885, conferred on street surface railroad corporations the right to lease their railroads or railroad routes to other corporations owning or operating such routes, whether the latter were railroad companies or not. When the laws were revised in 1890 the distinction between the two classes of companies, and the power given to each were preserved in sections 78 and 103, as above pointed out. When the railroad law was amended in 1892 by chapter 676 of that year, section 103 was omitted, and section 78 was made to read as follows:

"Sec. 78. Lease of Road. Any railroad corporation or any corporation owning or operating any railroad or railroad route within this state, may contract with any other such corporation for the use of their respective roads or routes, or any part thereof," etc.

Section 78, with slight verbal changes, which are of no importance here, has remained the law to the present time. We see, then, in section 78, as finally amended, the two different powers which were previously embodied in different sections of the law united into one. If section 103 of the railroad law had not been eliminated by chapter 676 of the Laws of 1892, and if section 78 had not taken the place of section 103, the lease by the Interurban Street Railway Company of the lines owned and operated by the Metropolitan Street Railway Company could not have been made at all. Section 103 apparently only authorized a railroad owning or operating a route in a city to lease similar lines from another railroad. Defendant, having been organized under the stock corporation law, must have resort to section 78 of the railroad law to justify its operation under lease of the lines of the old Metropolitan Street Railroad Company. It relies on section 78 for its very existence as an operating railroad in the city of New York. If the provisions of chapter 218, p. 195, of the Laws of 1839, were of themselves sufficient to confer upon all corporations, whether railroad companies or not, the right to lease such railroad routes as they might own to similar corporations, then there would have been no reason for the Legislature, in its wisdom, enacting section 1, c. 305, p. 525, of the Laws of 1885, and perpetuating the distinction between that section and chapter 218, p. 195, of the Laws of 1839 in the provisions of sections 78 and 103 of the railroad law of 1890. Moreover, the provisions of chapter 218, p. 195, of the Laws of 1839, in so far as they may be construed as conferring upon a street railroad corporation formed under chapter 140, p. 211, of the Laws of 1850, the un-

86 N.Y.S.—20

conditional right of leasing its road to another railroad corporation, have been repealed by section 5, c. 305, p. 525, of the Laws of 1885. Such being the state of the law, the defendant cannot escape the obvious and plain meaning of section 104 of the railroad law. The concluding sentence, that the provisons of the section shall only apply to railroads wholly within the limits of any one incorporated city or village, refers to railroads, and not to corporations. It was added when the right to lease was extended to every corporation owning a railroad within this state, to prevent the right of transfer for a single fare from being fastened upon long lines of country railroads. The true construction of section 104, therefore, is that it applies to railroad corporations and all other corporations within this state which, while formed under some other than the railroad law, have the right to own or operate a railroad within this state, and that it applies to leases as well as traffic contracts, and that the duty of giving transfers for a single fare shall apply only to such railroads as are wholly within the limits of any one incorporated city or village. That the Legislature intended section 104 to apply to all street railroad corporations, without regard to the law under which they were incorporated, or the date of their incorporation, appears by the amendments which were made to section 90 of the railroad law by chapter 434, p. 908, of the Laws of 1893, and by chapter 933, p. 791, of the Laws of 1895. Section 90 of the Railroad Law, as amended by said chapters, reads as follows:

"Sec. 90. Street Surface Railroads—General Provisions. The provision of this article shall apply to every corporation which, under the provisions thereof, or of any other law, has constructed or shall construct or operate, or has been or shall be organized to construct or operate, a street surface railroad, or any extension or extensions, branch or branches thereof, for public use in the conveyance of persons and property for compensation, upon and along any street, avenue, road, highway or private property, in any city, town or village, or in any two or more civil divisions of the state, and every such corporation must comply with the provisions of this article."

Under the true construction of the section 104, as above stated, the Metropolitan Street Railway Company formed in 1895 had no right to make the lease in question, and the defendant had no right to accept it, except upon the conditions imposed by said section.

The foregoing considerations are sufficient for a proper disposition of the appeal in the present case, and yet it may be well to refer to still another point. The first Metropolitan Street Railway Company, of 1893, was formed by a consolidation of companies then owning or operating street surface railroads within the limits of the city of New York. This consolidation was effected under the provisions of chapter 565 of the Laws of 1890, as amended. Before the passage of said chapter such companies could not be consolidated. By section 90 of the railroad law, as amended by chapter 434, p. 908, of the Laws of 1893, all the provisions of chapter 565 of the Laws of 1890, as amended, became binding upon the Metropolitan Street Railway Company thus formed, and its constituent companies. By taking advantage of the consolidation provisions of the law, both the said Metropolitan Street Railway Company and its constitutent companies became subject to all the provisions of the railroad law, and waived the privileges in regard to fares, if any, possessed by them under prior

laws. The consolidation agreement, on its face, says that it was made under the railroad law. The same remarks apply to the companies which executed the consolidation agreement of May 18, 1894, and to the second Metropolitan Street Railway Company formed by such agreement, and also to the companies which executed the consolidation agreement of November 7, 1895, and to the present Metropolitan Street Railway Company, formed by the agreement last referred to. When, therefore, the statutory provisions permitting these consolidations upon certain specified conditions are read, as they must be read, in connection with sections 78 and 104 of the railroad law, the conclusion seems inevitable that each of said consolidation agreements constituted a contract, within the meaning of that term as found in section 104, under which the duty arose to furnish transfers; and, if that is so, the present Metropolitan Street Railway Company was under such duty at the time of the execution of the lease to the Interurban Street Railway Company, and the latter by virtue of said lease could acquire no greater rights than its lessor had.

Upon the whole case, the judgment appealed from was erroneously placed upon the ground that the provisions of section 104 of the railroad law did not apply to the defendant, and it therefore must be reversed, and a new trial granted, with costs to the appellant to abide the event. Inasmuch, however, as the question involved is of great public importance, the respondent may have leave to appeal to the Appellate Division. All concur.